**HUDSON MOTORS PARTNERSHIP t/a Hudson Toyota, Plaintiff,**

v.

**CREST LEASING ENTERPRISES, INC. and Metro Auto Leasing, Inc., Defendants.**

No. 93–CV–5642.

United States District Court, E.D. New York.

March 21, 1994.

---

Marjorie Berman, Leventhal Slade & Krantz, New York City, for plaintiff.

David Goldstein, Spring Valley, NY, for defendants.

## MEMORANDUM AND ORDER

GLASSER, Senior District Judge:

This is a motion by plaintiff Hudson Motors Partnership t/a Hudson Toyota ("Hudson Toyota"), for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure against defendants Crest Leasing Enterprises, Inc. ("Crest") and Metro Auto Leasing, Inc. ("Metro") (collectively, the "Defendants"), on plaintiff's breach of contract and Uniform Commercial Code ("UCC") causes of action. In connection therewith plaintiff moves to dismiss Defendants' antitrust counterclaims. Plaintiff also seeks punitive damages on its breach of contract and UCC causes of actions and attorneys' fees and costs pursuant to 28 U.S.C. § 1927, and the court's inherent power, against Defendants and their attorney.

## FACTS

The material facts are not in dispute. Between July 22, 1993, and October 22, 1993, Hudson Toyota delivered a total of eight Toyota automobiles to Defendants. Defendants took possession of all eight vehicles and then refused to either pay for or return the automobiles. Defendants then sold seven of the eight vehicles to third parties even though they did not have valid title. Pl.'s 3(g) Statement, ¶¶ 6–64. See Complaint, ¶ 1. Specifically, Defendants tendered to plaintiff three checks which were returned for insufficient funds and three checks which were returned and marked "payment stopped."

Because one of the eight vehicles involved in this action had not been sold to a third party, Hudson Toyota moved ex parte for a seizure of this car.

### A. *The Ex Parte Order*

On December 13, 1993, this court signed an ex parte order of seizure (the "Order") directing the United States Marshal for the Eastern District of New York to seize a 1994 Toyota Camry, white exterior, grey interior, vehicle identification number 4T1SK12E4RU326466 (the "Chattel"). The court issued the Order based on, among other things, the allegations contained in the papers submitted by Hudson Toyota that it had sold the Chattel to Metro on or about October 18, 1993, in exchange for the promise of payment of $17,557.00, as evidenced by Invoice No. 6315, dated October 18, 1993. Affidavit of Gayle Epstein, December, 1993, ¶ 4, Ex. A. Ms. Epstein, who is responsible for fleet sales of Toyota automobiles for Hudson Toyota, stated that despite numerous attempts to procure payment for the automobile, Hudson Toyota had not received the $17,557.00. *Id.*, ¶ 6.

Based on this conduct, plaintiff argued that "there is every reason to believe that Metro will sell, at the earliest possible moment, the one and only car it still possesses [and] ... [b]ased on defendants' previous conduct, unless this order is granted without notice to Metro, Metro will sell, transfer, conceal or otherwise dispose of the car." Pl.'s Mem. in Support of Ex Parte Order, at 12. In this regard, plaintiff also brought to the court's attention the order of Justice Shainswit of the Supreme Court of the State of New York, Index No. 43145/90–001, July 24, 1990, in an action by the State of New York against Michael Silverstein ("Silverstein"), President of Crest and Metro, and several of his other companies. In this order, Justice Shainswit granted the Attorney–General's petition for an order (i) permanently enjoining the respondents from engaging in the business of selling or leasing motor vehicles unless a $2,000,000 performance bond was filed with the Department of Insurance; (ii) enjoining respondents from engaging in any fraudulent or illegal activity; and (iii) direct-

ing the non-bankrupt respondents to make restitution to consumers injured by the fraudulent or illegal conduct, and to pay $2,000 in costs to the State of New York. A copy of Justice Shainswit's order is attached as Exhibit 4 to the Affidavit of Marjorie E. Berman, December 30, 1993. In granting the People's petition, Justice Shainswit noted that,

> The petition alleges, in essence, that respondent Michael Silverstein operated the three corporate respondents, each claiming to be an authorized dealer for several makes of foreign and domestic cars. The petition sets forth a litany of fraudulent practices directed at consumers. Submitted in support of these allegations are a selection (several dozen) of the hundreds of complaints received by the State Bureau of Consumer Frauds and Protection against the three respondents.

*Id.* at 1–2.[1]

Based on plaintiff's submissions, the court agreed that unless the Order was granted without notice it was probable that the Chattel would become unavailable for seizure by reason of being transferred, concealed, disposed of, or removed from the state. The court also concluded that seizure was warranted because Defendants had failed to either pay for or return the Chattel and therefore plaintiff enjoyed a superior possessory right to the Chattel.

### B. The Attempted Seizure

On December 16, 1993, the United States Marshal for the Eastern District of New York unsuccessfully attempted to seize the Chattel from Defendants' place of business. In his affidavit, Deputy Marshal Steven C. Tocci stated that he had arranged to meet with a representative of plaintiff's, Mr. Scott Malzer, at the corner of 27th Street and 42nd Avenue in Long Island City, who was there to assist him in identifying the Chattel. Affidavit of Steven C. Tocci, undated, ¶ 3. As Deputy Marshal Tocci circled the block looking for Mr. Malzer, "we noticed we were being followed by a white Mercedes with New Jersey license plates. I was told by Mr. Malzer that a similar vehicle belonged to Michael Silverstein, the president of Metro Auto Leasing, Inc." *Id.*, ¶ 5. When Deputy Marshal Tocci, his partner Ray Wasson, and Mr. Malzer entered Defendants' showroom, "there were three spaces for vehicles and the middle space was noticeably empty. In addition, the showroom smelled of gasoline fumes." *Id.*, ¶ 7. Deputy Marshal Tocci contacted Silverstein's attorney ("Counsel") on the telephone and instructed him to instruct his client to return the car. *Id.*, ¶ 9. Counsel reported to Deputy Marshal Tocci that he could not get in touch with his client but had left messages for him. *Id.*, ¶ 11.

In his affidavit, Scott Malzer, a driver for the fleet sales division of Hudson Toyota, stated that while waiting at the corner of 27th Street and 42nd Avenue for the Deputy Marshal, he was asked by a driver employed by Silverstein what he was doing. Affidavit of Scott Malzer, December, 1993, ¶ 6. Malzer replied that he was "making a delivery." *Id.* Approximately fifteen minutes later he went to a telephone booth to call his employer and "I heard a car behind me and turned around. Silverstein stood in front of me holding a camera trying to take my picture. I went to another phone booth and called my employer." *Id.*, ¶ 7. Malzer states that as he and the Marshal approached the showroom, "we saw Silverstein's car, a white Mercedes with New Jersey license plates, drive away." *Id.*, ¶ 9. As stated above, when Malzer and the Marshal entered the showroom to seize the Chattel, it was gone.

### C. Order of Confirmation

On January 14, 1994, Defendants moved to quash the ex parte order and consolidate this

---

1. Defendants contend that this information is collateral to the issues in this action and that plaintiff should be sanctioned for bringing it to the court's attention. Defs.' Mem. at 5. Although plaintiff has also made reference to this decision in connection with its request for punitive damages, this information first came to light in connection with plaintiff's request for an order of seizure. In that regard, this information was probative of whether an ex parte order was appropriate. The decision to award punitive damages, *infra,* is not based on this information. However, as the discussion which follows concerning the attempted seizure of the Chattel makes clear, Defendants' actions were commensurate with the allegations in *People of the State of New York v. Michael Oldsmobile Corp., et al.,* No. 43145/90-001.

action with Defendants' antitrust action currently pending before Judge Korman in the Eastern District of New York.[2] Plaintiff cross-moved to confirm the Order. Defendants based their motion on three grounds: (i) the invoice attached to plaintiff's papers in support of its ex parte order was a "fraud"; (ii) plaintiff failed to report that a "related case" was pending before Judge Korman; and (iii) by bringing its ex parte motion plaintiff breached an agreement with Defendants to retain the status quo pending the filing of plaintiff's answer in the antitrust action. The court rejected these assertions and confirmed the Order in an order dated January 14, 1994. The court also denied Defendants' consolidation motion. The Chattel was eventually surrendered to plaintiff on or about January 17, 1994. In its Answer dated January 26, 1994, Defendants admitted the essential and material allegations of Hudson Toyota's complaint and asserted as a "set-off" the allegations contained in their antitrust complaint.

Plaintiff now moves to dismiss Defendants' set-off and seeks summary judgment and punitive damages on its breach of contract and UCC causes of action. Defendants offer no opposition to the appropriateness of summary judgment and the dismissal of the set-off. *See* Affidavit of Counsel, February 24, 1994, ¶ 3 ("... defendants offer no opposition to plaintiff's motion for summary judgment on the non-payment claim relative to the sale of eight (8) cars...."). Defendants also offer no opposition to plaintiff's claim that damages total $127,305.00, plus interest. Defendants, however, do oppose the application for attorneys' fees and costs; they also argue that punitive damages are inappropriate in this situation.

## DISCUSSION

### I. *Punitive Damages*

■ The general rule under New York law is that punitive damages are not available in breach of contract actions because they deal with wrongs between private parties. *Hutton v. Klabal,* 726 F.Supp. 67, 73 (S.D.N.Y. 1989) ("Under New York law, punitive damages cannot be awarded in breach of contract cases which involve private wrongs and where no public rights are involved."); *Parke–Hayden, Inc. v. Lowes Theatre Management Corp.,* 789 F.Supp. 1257, 1267 (S.D.N.Y.1992) ("New York courts, the Second Circuit and courts within this district are virtually unanimous that punitive damages may not be awarded in breach of contract cases, unless the wrong is aimed at the public generally.").[3]

■ The court in *Parke–Hayden,* however, may have overstated the case. If the wrong associated with the breach is not aimed at the public, but the actions of the breaching party "involve that degree of bad faith evincing a disingenuous or dishonest failure to carry out a contract," *Aero Garage Corp. v. Hirschfeld,* 185 A.D.2d 775, 777, 586 N.Y.S.2d 611, 613 (1st Dep't) (punitive damages appropriate where defendant was obligated to obtain an extension of certificate of occupancy, did not do so, and thwarted plaintiff's attempts to obtain said certificate) (internal quotations omitted), *leave to appeal denied,* 81 N.Y.2d 701, 610 N.E.2d 388, 594 N.Y.S.2d 715 (1992), then punitive damages are appropriate. *See also Williamson, Picket, Gross, Inc. v. Hirschfeld,* 92 A.D.2d 289, 295, 460 N.Y.S.2d 36, 41 (1st Dep't 1983) (no punitive damages if the offending conduct merely constitutes breach of contract, but punitive damages are appropriate if offending conduct involves a high degree of bad faith); *Jackson v. Kump,* No. 93 Civ. 3519, 1994 WL 9691 at *6 (S.D.N.Y. Jan. 13, 1994) ("In New York ... even where a public right is not at issue, punitive damages might be available for breach of contract.") (*citing Aero Garage* ). In the leading tort case involving the propriety of punitive damages, New York's Court of Appeals stated that,

> Punitive or exemplary damages have been allowed in cases where the wrong

---

**2.** In *Crest Leasing Enterprises, Inc. and Metro Auto Leasing, Inc. v. Toyota Motor Sales U.S.A., Inc., et al.,* No. 93 Civ. 5452 (ERK), Crest and Metro seek damages against Hudson Toyota and others based on, among other things, an alleged violation of New York's Donnelly Act, N.Y.Gen. Bus.L. § 340 (McKinney 1988).

**3.** Both parties agree that New York law applies.

complained of is morally culpable, or is actuated by evil and reprehensible motives, not only to punish the defendant but to deter him, as well as others who might otherwise be so prompted, from indulging in similar conduct in the future.... The list of actions in which punitive damages have been permitted in this State is long ... libel ... desecration of a grave ... forcible abduction of a minor child ... fraud and deceit.... "It is not the form of the action that gives the right to the jury to give punitory damages, but the moral culpability of the defendant."

*Walker v. Sheldon,* 10 N.Y.2d 401, 404–05, 179 N.E.2d 497, 498, 223 N.Y.S.2d 488, 490–91 (1961) (citations omitted) (in fraud and deceit action where defendant induced plaintiff to enter into a contract by means of false and fraudulent representations and such activities were the means by which it did business, punitive damages are appropriate). Given this standard of review, punitive damages will not be awarded in a breach of contract action unless to do so would deter "morally culpable conduct." *Werner, Zaroff, Slotnick, Stern & Askenazy v. Lewis,* 155 Misc.2d 558, 561, 588 N.Y.S.2d 960, 961–62 (N.Y.Ct.Cl.1992) (where plaintiff's computer crashes due to a conditional statement that defendant had secretly put into plaintiff's program, punitive damages are appropriate in part because defendant's action were arguably criminal). Punitive damages are not appropriate in a straightforward breach of contract action. *Geler v. National Westminster Bank USA,* 770 F.Supp. 210 (S.D.N.Y. 1991) (no punitive damages for failure to release funds allegedly owed pursuant to a certificate of deposit).

▮ Applying these general criteria to this case, punitive damages are appropriate because the actions of Defendants evidence a "degree of bad faith evincing a disingenuous or dishonest failure to carry out a contract."

*Aero Garage,* 185 A.D.2d at 777, 586 N.Y.S.2d at 613 (internal quotations omitted).[4] To begin, there is no dispute that Defendants intentionally and willfully breached their contractual obligations under the sales contracts. Defs.' 3(g) Statement, ¶¶ 6–64. If that were all Defendants did punitive damages would not be available. However, Defendants went beyond a mere breach of their contracts and embarked on a course to thwart at every turn plaintiff's contractual rights. Moreover, these efforts were performed in bad faith. For example, in connection with the motion to quash the ex parte order of seizure, Silverstein stated under oath as follows:

> As defendants' attorneys inform me, the crux of plaintiffs' [sic] argument that they are entitled to possession of the subject automobile rests upon their contention that the car in question was "sold" to Metro Auto Leasing, Inc. Such a contention by plaintiffs is an outright lie!

Affidavit of Michael Silverstein, December 23, 1993 ("Silverstein Aff'd,") ¶ 5. However, Defendants now admit that the car was in fact sold to them by virtue of the fact that they are not opposing the motion for summary judgment and by the fact that they have left unanswered Paragraph 51 of plaintiff's 3(g) statement ("On or about October 18, 1993, plaintiff and Metro entered into a contract of sale for delivery of a 1994 Toyota Camry....").[5] Silverstein, therefore, was demonstrating bad faith (and perhaps perjury) in his statement to the court that the Chattel had not been sold and that an order of seizure was unwarranted.

▮ There is also no dispute that Defendants stopped payment on three checks; did not provide funds to cover the other three checks; and refused to return the Chattel in retaliation for plaintiff's alleged violation of New York's antitrust statute. *See* Defs.'

---

4. Plaintiff also argues that punitive damages are appropriate because Defendants' breach harmed the public in general because the persons who purchased the cars were not given the appropriate documentation evidencing ownership. However, there is no indication in the record that Defendants' activities were aimed at the public in general; rather, harm to the public was a byproduct of Defendants' actions.

5. Local Rule 3(g) provides in relevant part that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."

Mem. at 3 ("[I]t has been defendants' position throughout this litigation that they stopped payment on the checks as a result of plaintiff's involvement in a conspiracy ... to put defendants out of business."). Punitive damages are appropriate when they are necessary to both punish a party for egregious behavior and to deter future similar conduct. *Sharapata v. Town of Islip,* 56 N.Y.2d 332, 335, 437 N.E.2d 1104, 1105, 452 N.Y.S.2d 347, 348 (1982) ("Punitive or 'exemplary' damages, sometimes known as 'smart money', and thus seemingly attuned to the criminal rather than the civil side of the law, are not intended to compensate the injured party but to punish the tort-feasor for his conduct and to deter him and others like him from similar action in the future.") (footnote omitted). The twin aims of punitive damages in the tort context—punishment and deterrence—are equally applicable in the contract context if, as in this case, a defendant's actions are egregious. Simply put, punitive damages are appropriate to remind Defendants that so-called self-help for antitrust violations in the form of selling cars to third persons without paying the seller for those items is unacceptable commercial behavior.

Punitive damages are also appropriate in this case because the actions of Defendants are similar to those steps taken by the defendants in *Aero Garage;* namely, a campaign to thwart plaintiff's contractual rights. Whereas in *Aero Garage* the defendants affirmatively sought to block plaintiff's contractual rights by, among other things, defying a court injunction and renewing their request that the certificate awarded to plaintiff be revoked, Defendants in this case failed to honor this court's order of seizure. As the discussion above demonstrates, it is more probable than not that Defendants moved the Chattel just prior to the arrival of the Marshal. However, it is uncontroverted that Defendants knew of the order of seizure as early as December 23, 1993 (the Order is attached to Silverstein's affidavit in support of Defendants' motion to quash) but did not surrender the automobile until on or about January 17, 1994, following this court's order of confirmation. This is an example of bad faith (and perhaps criminal conduct) by Defendants evincing a dishonest refusal to honor their contractual duty to either pay for the car or return it.

Furthermore, as in *Aero Garage* where the defendants instituted administrative proceedings in bad faith, Defendants in this action moved to quash the ex parte order on frivolous grounds. They originally argued that an invoice attached to plaintiff's papers in support of its ex parte order was a "fraud." Silverstein stated in his affidavit that plaintiff never gave him the invoice in question and that in his dealings with plaintiff invoices were never tendered to him unless they were accompanied by a check from Defendants to plaintiff. Silverstein therefore argued that since he did not tender a check to plaintiff, the invoice must have been fraudulent:

> I believe the "invoice" to be the product of a total and complete fabrication and back-dated by Ms. Epstein. Through the course of defendants' dealings with plaintiff (approximately 400 sales per year since 1989), plaintiff *never* submitted invoices for any of the cars delivered to defendants unless accompanied by a check. Conspicuous by its absence is defendants' check which should have accompanied the invoice in question. Accordingly, I believe the "invoice" was created by Ms. Epstein solely for the purpose of creating a false pretense upon which plaintiff could proceed to obtain the *ex parte* Order at issue here.

Silverstein Aff'd, ¶ 6 (emphasis in original).

Defendants' arguments were rejected and the Order confirmed because Silverstein's allegations were groundless. First, although Ms. Epstein conceded that she did not tender the invoice upon delivery of the vehicle, she explained that it was common practice to deliver automobiles to Defendants in reliance on their promise that a check would be forthcoming. Affidavit of Gayle Epstein, December 29, 1993 ("Epstein Aff'd"), ¶ 2 ("When I sold the Chattel to Metro, Michael Silverstein, Metro's president, told me that he would send a check. Over the many years during which I sold automobiles to Silverstein's companies, I allowed Silverstein to tender payment a day or two after he took delivery of the automobiles."). Given that this was common practice, Silverstein's affi-

davit is suspect. Moreover, the fact that the invoice was not delivered did not establish that the car was not sold:

> If I had received a check for the Chattel I would have given to Silverstein, upon his request, a copy of the invoice. I would have also given him a *copy* of the Manufacturer's Statement of Origin (the original after his check cleared), the Driver's Manual, the Warranty and the extra keys for the car. I did not give any of these items to Silverstein because I never received a check from him. I have in my possession all of these items.

*Id.,* ¶ 6 (emphasis in original).[6]

Second, although Defendants argued that the number of the invoice indicated that it was "back dated," Silverstein Aff'd, ¶ 6 ("I believe that an examination of plaintiff's business records will reveal that the number on the 'invoice' ... will be out of sequence with other invoices written during the relevant time period and that the same was back-dated by Ms. Epstein solely for the purposes of deceiving this Court and obtaining the *ex parte* Order of Seizure."), Ms. Epstein explained that Hudson Toyota's invoices are not executed in sequential order. Epstein Aff'd, ¶ 3 ("[The assistants] use the invoices as needed *in no particular order.*") (emphasis in original). Therefore, "[t]he sequence in which invoices are used does not establish the sequence in which cars are sold and has no bearing on whether an invoice was properly or timely prepared." *Id.,* ¶ 4. Despite their unfounded claim that a review of plaintiff's invoices would indicate wrongful behavior, Defendants have not come forward with any evidence to indicate that plaintiff presented fraudulent documents in connection with its application for an ex parte order of seizure.

Given the actions of Defendants as recounted above, the reasons cited by the *Aero Garage* court in imposing punitive damages apply with equal force to this situation:

> We cannot agree with the dissent that this attempt on [the breaching party's] part to "obtain a solution more in accord with their own interests" should not be penalized when it invoked the types of methods used here, including the fully knowing and intentional breach of unambiguous contractual provisions, the flouting of court ordered injunctions and the bad faith institution of administrative proceedings.

*Aero Garage,* 185 A.D.2d at 777, 586 N.Y.S.2d at 613.

Defendants, however, argue that punitive damages are not appropriate in this case because their actions did not constitute morally culpable conduct. Defs.' Mem. at 4. Defendants also contend that, pursuant to New York law, punitive damages are not available in breach of contract cases "even if committed wilfully and without justification," Defs.' Mem. at 5, and rely on *O'Dell v. New York Property Ins. Underwriting Assoc.,* 145 A.D.2d 791, 535 N.Y.S.2d 777 (3d Dep't 1988) (no punitive damages for plaintiff who did not receive fire insurance proceeds following destruction of her home because plaintiff is not seeking to vindicate a public right even though breach was wilful); *Charles v. Onondaga Community College,* 69 A.D.2d 144, 418 N.Y.S.2d 718 (4th Dep't) (because wrongful discharge was not part of a larger scheme to injure plaintiff punitive damages would not be appropriate), *appeal dismissed,* 48 N.Y.2d 650, 396 N.E.2d 482, 421 N.Y.S.2d 200 (1979); and *Wegman v. Dairylea Coop, Inc.,* 50 A.D.2d 108, 113, 376 N.Y.S.2d 728, 735 (4th Dep't 1975) (because plaintiff's cause of action for retaliatory discharge and fraud in inducement of employment are dismissed, plaintiff's cause of action for punitive damages must be dismissed because "[i]t is well settled that punitive damages are not available in New York for breach of contract."), *appeal dismissed,* 38 N.Y.2d 918, 346 N.E.2d 817, 382 N.Y.S.2d 979 (1976).

However, as the discussion above demonstrates, New York law does allow for punitive damages in breach of contract cases if the actions of the breaching party evidence such bad faith that the twin aims of punitive damages would be vindicated. The blanket state-

---

**6.** This was the only logical conclusion because other than presenting the car to Defendants as a gift, there is no other reasonable justification for plaintiff's actions (*i.e.,* transferring the Chattel without receiving a check).

ment against punitive damages for contract actions as stated in *Wegman* is not an accurate reflection of New York law. Defendants argue that their actions were not egregious because they were simply protecting their business interests from the allegedly predatory behavior of Hudson Toyota. However, an avowed purpose of protecting business interests does not justify the wrongful misappropriation of the property of another. Here, Defendants intentionally and wilfully breached their contractual obligations by stopping payment on certain checks; defied the court's Order in spiriting away the Chattel prior to the arrival of the Marshal; refused to turn over the Chattel even after it was aware of the Order; and moved to quash the Order (and thus further frustrate plaintiff's contractual rights) on frivolous grounds. This is, therefore, that rare case where the actions of the breaching party require the imposition of punitive damages even though the wrongs were not aimed at the public in general.

## II. *Sanctions*

### A. *28 U.S.C. § 1927*

Section 1927 of Title 28 of the United States Code provides as follows:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. .

■ "By its terms, § 1927 looks to unreasonable and vexatious multiplications of proceedings; and it imposes an obligation on attorneys through the entire litigation to avoid dilatory tactics." *United States v. International Broth. of Teamsters*, 948 F.2d 1338, 1345 (2d Cir.1991). The purpose of the statute is "to deter unnecessary delays in litigation." *Id.* (quoting H.R.Conf.Rep. No. 1234, 96th Cong., 2d Sess. 8, *reprinted in* 1980 U.S.Code Cong. & Admin.News 2716, 2782). "The statute is indifferent to the eq-

uities of a dispute and to the values advanced by the substantive law. It is concerned only with limiting the abuse of court processes." *Roadway Express v. Piper*, 447 U.S. 752, 762, 100 S.Ct. 2455, 2462, 65 L.Ed.2d 488 (1980). Without a demonstration of bad faith on the part of the attorney in question, sanctions pursuant to this statute are inappropriate. "Imposition of a sanction under § 1927 requires a 'clear showing of bad faith.' " *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir.1986) (quoting *Kamen v. American Telephone & Telegraph Co.*, 791 F.2d 1006, 1010 (2d Cir.1986)), *cert. denied*, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987). The court in *Oliveri* wrote,

Like an award made pursuant to the court's inherent power, an award under § 1927 is proper when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay.

*Oliveri*, 803 F.2d at 1273. Furthermore, Second Circuit authority makes clear that awards pursuant to Section 1927 are made only against attorneys. *Id.; Teamsters*, 948 F.2d at 1345 ("clients may not be saddled with such awards.").

■ Conduct which allows for the imposition of sanctions under Section 1927 pursuant to the discretion of the court include the following: resubmitting a motion that had previously been denied, *Siderpali, S.P.A. v. Judal Industries, Inc.*, 833 F.Supp. 1023, 1029 (S.D.N.Y.1993); bringing a motion based on "facts" the opposite of which were previously found by the court, *id.* at 1036; making several insupportable bias recusal motions and repeated motions to reargue, *Sassower v. Field*, 138 F.R.D. 369, 375–76 (S.D.N.Y.1991), *aff'd in part and vacated on other grounds*, 973 F.2d 75 (2d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993); " 'continually engag[ing] in obfuscation of the issues, hyperbolism and groundless presumptions' in addition to insinuating that the court was biased,' " *Cruz v. Savage*, 896 F.2d 626, 634 (1st Cir.1990) (rejecting bad faith standard); and waiting until the eve of trial before making a jury demand, *Kotsilieris v. Chalmers*,

966 F.2d 1181 (7th Cir.1992). In *Knorr Brake Corp. v. Harbil, Inc.*, 738 F.2d 223, 226–27 (7th Cir.1984), the Seventh Circuit made the following observation which is relevant to the motion in this action:

> Where ... counsel's alleged misconduct was the filing and arguing of a claim, it is not sufficient that the claim be found meritless; the claim must be without a plausible legal or factual basis and lacking in justification.

(footnote omitted). The court in *Harbil* also noted that, "[a] court may infer intent from a total lack of factual or legal basis for a suit." *Id.* at 227. Also helpful is the comment by the Third Circuit in reversing a district court's imposition of sanctions based on the fact that an attorney filed a Title VII action even though before filing he had been informed that the complaint was untimely:

> In our view, what would be indicative of bad faith in a case such as this one, would be some indication of an intentional advancement of a baseless contention that is made for an ulterior purpose, *e.g.*, harassment or delay.

*Ford v. Temple Hosp.*, 790 F.2d 342, 347 (3d Cir.1986). With these standards of conduct in mind, we now turn to the specific actions which plaintiff contends unreasonably and vexatiously multiplied these proceedings.

### 1. *Motion to Quash the Ex Parte Order of Seizure*

As recounted above in some detail, Defendants brought a motion to quash this court's ex parte order of seizure on three separate grounds: (i) a fraudulent invoice was given to the court; (ii) plaintiff failed to report the "related" antitrust action; and (iii) plaintiff breached an agreement to retain the status quo pending the filing of plaintiff's answer in the antitrust action. Plaintiff contends that "Defendants' bad faith is ... demonstrated by the complete lack of legal or factual basis for bringing this motion to quash." Pl.'s Mem. at 26. I agree. First, with reference to the invoice, although Silverstein claimed that a review of Hudson Toyota's invoices would reveal that the court had been the victim of a fraud, Silverstein Aff'd, ¶ 6, Defendants have not brought to the court's

attention *any* evidence which would call into doubt the veracity of plaintiff's claim that the car in question was sold to Defendants; that Defendants took possession of the car; that Defendants then refused to pay for the car; and that the car was then sold to a third person in blatant disregard of plaintiff's contractual rights. Defendants now concede that all of that is true given their silence in the face of plaintiff's motion for summary judgment and plaintiff's 3(g) statement. If Defendants and Counsel now know that the automobile was sold and yet never paid for, how is it they could not have known that in December of 1993 when Defendants moved to quash the ex parte order? Counsel's bad faith in moving to quash the Order is also evidenced by his admission that Defendants were holding the car hostage irrespective of the court's Order. He wrote to plaintiff's counsel approximately two weeks *after* the order of seizure had been granted and stated that "[u]pon receipt of an Order indicating that the ex parte Order regarding seizure of the vehicle in question has been rescinded, we will enter into an agreement regarding the vehicle." Affidavit of Counsel, January 6, 1994, Ex. C (letter of December 27, 1993 to plaintiff's counsel). This evidences the fact that Defendants were in possession of the car at the time of the Order and that Counsel was aware of that fact.

It is clear to this court that Defendants were stalling for time and were unreasonably and vexatiously multiplying these proceedings by compelling Hudson Toyota to oppose a meritless motion to quash. For his part, Counsel argues that "[h]aving been informed by the defendants that plaintiff had never forwarded an invoice with regard to the sale of any car during their four (4) year prior course of dealing, there existed a legitimate basis to believe that the invoice in question had been fraudulently generated by plaintiff for the sole purpose of securing this Court's signature on the *ex parte* Order." Defs.' Mem. at 7. However, given that Defendants and Counsel now concede that there was never any legitimate defense to their wrongful withholding of the Chattel, this explanation must be rejected as untenable.

Section 7102(c) of New York's Civil Practice Law and Rules provides in relevant part that an order of seizure is available if the affidavit in support of such an application establishes that the plaintiff is entitled to possession by virtue of the facts set forth and that the chattel is wrongfully held by the defendants. Counsel did not offer *any* facts which would rebut plaintiff's allegations that Hudson Toyota delivered the Chattel, that it was not paid for, and that Defendants did not return the vehicle. Under such circumstances, and without more, an order of seizure was appropriate, *see General Motors Acceptance Corp. v. Berg and Duffy*, 118 Misc.2d 525, 529, 460 N.Y.S.2d 899, 901 (N.Y.Sup.Ct.1983) (where purchaser ceases paying seller pursuant to installment contract "plaintiff has established, prima facie, a superior possessory right for the purposes of its CPLR 7102 application."), and Defendants offered no credible reason why the Order should have been quashed. Therefore, the motion was brought without any legal or factual justification which drives this court to conclude that it was brought for an improper purpose (*i.e.*, delay or harassment), thus establishing Counsel's bad faith. This conclusion is buttressed by the fact that, as evidenced by Counsel's December 27, 1993 letter, he was aware of the Order and was aware that Defendants had possession of the car and yet informed plaintiff that the Order would not be honored.

Regarding the second and third bases for the motion to quash—failure to inform the court of the "related" antitrust action and breach of an alleged agreement—neither of these allegations are sufficient legal or factual justifications for moving to quash an order of seizure. As discussed above, it was incumbent upon Defendants, if they wished to contest the court's Order, to demonstrate that plaintiff did not possess a superior possessory right to the chattel. They have now admitted that Hudson Toyota does have a superior possessory right and are therefore not contesting the motion for summary judg-

ment to rescind the contract for that automobile. When placed in context along side Defendants' other actions of which Counsel was a party (*e.g.*, failing to turn over the car after the court ordered its seizure), it is evident that the motion to quash was another step in unreasonably and vexatiously multiplying these proceedings.[7]

### 2. *Motion to Consolidate*

Plaintiff also contends that the motion to consolidate this action with Defendants' antitrust action presently pending before Judge Korman was also brought in bad faith in an effort to vexatiously and unreasonably multiply these proceedings. In the action before Judge Korman, Crest and Metro have alleged that plaintiff and two of its related companies, together with Toyota Motor Sales U.S.A., Inc. and Toyota Motor Distributors, Inc., conspired to deprive Crest and Metro of the right to buy Toyota vehicles in violation of, among other things, New York's antitrust statute, the Donnelly Act, N.Y.Gen.Bus.L. § 340 (McKinney 1988). The complaint states in relevant part as follows:

> In or about October 1993, [Hudson Toyota] advised Plaintiffs that the Dealership Defendants [Hudson Toyota and its related companies] would no longer permit the sale of any Toyota automobiles to Plaintiffs. [Hudson Toyota] thereafter admitted to Plaintiffs that the decision not to sell any Toyota automobiles to Plaintiffs was the result of agreements and arrangements among and between the Dealership Defendants and [Toyota Motor Sales U.S.A., Inc. and Toyota Motor Distributors, Inc.], and was solely based upon a determination to eliminate the competition from Plaintiffs, and others similarly situated, and Toyota dealers, and to maintain an artificially high retail price level for the Toyota automobile.

Silverstein Aff'd, Ex. D, ¶ 12. The complaint alleges wrongful conduct by the two Toyota

---

**7.** Counsel defends the motion to quash on the ground that during a telephone conversation with one of Chambers' law clerks, and in response to Counsel's query, he was informed that an order to show cause was not necessary since the Chattel had not been seized and counsel should therefore proceed via a regular motion. Sanctions, however, are appropriate because of the legal and factual paucity of the motion, not because it was procedurally infirm.

corporations who are not parties to this action. *Id.*, ¶¶ 14–17 (defendants threatened, coerced, solicited, and otherwise engaged other Toyota dealerships not to sell Toyota automobiles to plaintiffs).

■ Sanctions are appropriate because this motion to consolidate was completely without merit. As discussed in greater detail below, a defendant in a breach of contract action can not, as a general rule, assert as a counterclaim violations of the antitrust laws. The two causes of action—even if they involve the same parties—are not coterminous because there is nothing in an antitrust action which would justify a buyer receiving an item and yet not paying for it. In other words, the issues of law and fact in an antitrust and breach of contract action are rarely, if ever, similar. In this situation, for example, Defendants must prove, among other things, predatory behavior by Hudson Toyota and may recover treble damages if the facts so warrant. The present action, on the other hand, is a garden variety UCC and breach of contract claim. This court is again driven to the conclusion, therefore, that the motion to consolidate was brought in bad faith in order to create more delay. Because the "attorney's actions [were] so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose," *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir.1986), sanctions pursuant to Section 1927 are appropriate.

### 3. *Defendants' Set-off Counterclaim*

Although Defendants now concede that summary judgment is available on plaintiff's breach of contract and UCC causes of action, in their Answer to the complaint they asserted as a counterclaim set-off the allegations contained in their antitrust complaint now pending before Judge Korman. Specifically, Defendants asserted that "[u]pon information and belief, during or about October 1993, plaintiff Hudson, acting in concert and in conspiracy with Toyota Motor Sales, USA, Inc. and Toyota Motor Distributors, Inc., agreed not to sell new Toyota automobiles to defendants Crest and Metro." Answer, ¶ 66. Although the court had already held that the

antitrust action and Hudson Toyota's UCC and breach of contract action were not related, and hence consolidation was inappropriate, Defendants alleged that "[u]pon information and belief, Hudson's involvement in an agreement with Toyota under which Hudson agreed to refuse to sell new Toyota automobiles to defendants constitutes an agreement, arrangement or combination in restraint of competition in the retail sale and lease of Toyota automobiles, in violation of § 340 of the General Business Law of the State of New York." Answer, ¶ 70. Defendants also stated that they "stopped payment and did not make funds available to cover the checks referenced in plaintiff's complaint as a set-off on its damages suffered as a result of Hudson's conduct and involvement in an illegal agreement with Toyota not to sell new Toyota automobiles to defendants." Answer, ¶ 73.

■ Plaintiff argues that the inclusion of this counterclaim set-off warrants sanctions because only in limited circumstances do antitrust claims constitute valid defenses to a breach of contract and hence Defendants' inclusion of this counterclaim in this action was in bad faith and vexatious. "It is now well established that the remedy for violation of the antitrust law is not avoidance of payments due under a contract, but rather the redress which the antitrust statute establishes,—a private treble damage action." *Lewis v. Seanor Coal Co.*, 382 F.2d 437, 441 (3d Cir.1967), *cert. denied*, 390 U.S. 947, 88 S.Ct. 1035, 19 L.Ed.2d 1137 (1968). Antitrust counterclaims are therefore disfavored in a simple breach of contract claim. *Kelly v. Kosuga*, 358 U.S. 516, 517, 79 S.Ct. 429, 431, 3 L.Ed.2d 475 (1959) (in diversity action for breach of contract, district court properly granted plaintiff's motion to strike affirmative defense of violation of Section 1 of the Sherman Act; "[a]s a defense to an action based on contract, the plea of illegality based on violation of the Sherman Act has not met with much favor in this Court.") (footnote omitted). The exception to this general rule is limited to those cases where the judgment of the court would itself be enforcing antitrust conduct. *Viacom Int'l Inc. v. Tandem Prods., Inc.*, 526 F.2d 593, 596–600 (2d Cir. 1975) (court notes that as a general rule a defendant in breach of contract action cannot

assert an antitrust defense where the contract was an "intelligible economic transaction in itself" and not "part of . . . any general plan or scheme that the law condemned") (quoting *Kelly*, 358 U.S. at 521, 79 S.Ct. at 432, and *Continental Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227, 260, 29 S.Ct. 280, 291, 53 L.Ed.. 486 (1909), respectively). The court in *Viacom* also noted that "the overriding consideration which has persuaded the Supreme Court [in not allowing antitrust defenses in contract actions] is its concern that the successful interposition of antitrust defenses is too likely to enrich parties who reap the benefits of a contract and then seek to avoid the corresponding burdens." *Viacom*, 526 F.2d at 599. *See also McDonald's Corp. v. Robert A. Makin, Inc.*, 653 F.Supp. 401, 404–05 (W.D.N.Y.1986) (in breach of contract action by franchisor against franchisees for non-payment of franchise fees, franchisees' antitrust counterclaims cannot defeat franchisor's motion for summary judgment).

 Counsel for Defendants offers no legal or factual justification for the inclusion of their antitrust counterclaim but states instead that "[t]he assertion of the counterclaim was done for the purpose of attempting to keep the defendants alive while its antitrust claim against plaintiff and Toyota proceeds through the Federal Court system." Defs.' Mem. at 8. Defendants concede, therefore, that they did not impose the antitrust counterclaim because they had a good faith belief based on the law and the facts that this action fell within the narrow exception to the general rule. Given that the contracts at issue in this action are not part of the allegedly predatory behavior of Hudson Toyota, there would not have been any basis upon which to assert this counterclaim. Defendants' assertion of this counterclaim was, therefore, made in bad faith and unreasonably and vexatiously multiplied these proceedings by forcing Hudson Toyota to move for its dismissal.[8]

### B. *The Court's Inherent Power*

 "Under the inherent power of the court to supervise and control its own proceedings, an exception to the American Rule has evolved which permits the court to award a reasonable attorneys' fee to the prevailing party when the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons[.]' " *Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir.1986) (quoting *F.D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Co., Inc.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974)). Unlike awards pursuant to 28 U.S.C. § 1927, sanctions pursuant to the court's inherent power may be made against the losing party or against the losing party's attorney, or both. *Oliveri*, 803 F.2d at 1273 ("an award made under the court's inherent power may be made against an attorney, a party, or both."). The standard of bad faith is the same under both Section 1927 and the court's inherent power. *Id.* Furthermore, an award pursuant to the court's inherent power can be assessed against a party for either commencing or for continuing an action in bad faith, vexatiously, wantonly, or for oppressive reasons. *Oliveri*, 803 F.2d at 1272. " '[B]ad faith' may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation." *Hall v. Cole*, 412 U.S. 1, 15, 93 S.Ct. 1943, 1951, 36 L.Ed.2d 702 (1973). The Second Circuit has made clear that,

> [W]e have declined to uphold awards under the bad-faith exception absent both clear evidence that the challenged actions are entirely without color and [are taken] for reasons of harassment or delay or for other improper purposes, and a high degree of specificity in the factual findings of the [the] lower courts.

*Dow Chemical Pacific Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 344 (2d Cir.1986) (citations and internal quotations omitted). Plaintiff seeks an award of attorneys' fees

---

8. Defendants were put on notice that this counterclaim set-off would lead to a motion for sanctions. Affidavit of Marjorie E. Berman, March 2, 1994, Ex. A (letter of January 25, 1994 to Defendants' attorney). In fact, Defendants' law firm again telephoned the law clerk referenced above in footnote 7 on January 26, 1994, the date of the Answer, and informed the clerk that plaintiff had threatened the firm with sanctions and asked if the Court would advise the firm on the propriety of asserting the antitrust counterclaims. The court declined to issue an advisory opinion.

against Defendants in relation to the following.

### 1. Dishonoring Contractual Obligations

 The only justification offered by Defendants for the breach of their contractual obligations was their desire to punish Hudson Toyota for its allegedly predatory behavior. Although this establishes that its actions were "entirely without color," the court has already determined that punitive damages are appropriate for this, and other behavior, in connection with Defendants' breach. An award of attorneys' fees in addition to this assessment would give plaintiff a windfall and it is therefore unnecessary.

### 2. Motion to Quash the Ex Parte Order of Seizure

 As recounted above, it is clear that Silverstein played a role in avoiding this court's ex parte order. Given the Second Circuit's requirement that this court state with "a high degree of specificity ... the factual findings" regarding the sanctioned party's conduct, the court notes that the following facts are uncontroverted: (i) Defendants knew of the ex parte order as early as December 23, 1993 (Silverstein Aff'd) but did not surrender the car to plaintiff until on or about January 17, 1994; and (ii) in support of the motion to quash the Order the president of Crest and Metro stated under oath that the Chattel was never sold to Defendants (Silverstein Aff'd, ¶ 5), but Defendants now admit as much by leaving unanswered Paragraph 51 of Hudson Toyota's 3(g) Statement. Silverstein stated under·oath that there were valid reasons for moving to quash the Order when, in fact, there was no good faith basis in believing that Hudson Toyota had defrauded the court or that Defendants possessed a superior possessory right to the Chattel. Therefore, for the reasons stated above in Section II.A.1 of this memorandum, Defendants as well as Defendants' counsel are to be assessed attorneys' fees in connection with Hudson Toyota's opposition to the motion to quash the ex parte order.

### 3. Motion to Consolidate

As demonstrated in Section II.A.2 of this memorandum, the motion to consolidate was completely without merit and hence Defendants will be sanctioned for this conduct pursuant to the court's inherent power.

### 4. Defendants' Set-off Counterclaim

As demonstrated in Section II.A.3 of this memorandum, the assertion of the antitrust counterclaim was brought vexatiously and in bad faith and hence Defendants will be sanctioned for this conduct pursuant to the court's inherent power.

### CONCLUSION

For the foregoing reasons, the court orders as follows:

1. Hudson Toyota's motion to dismiss Defendants' antitrust counterclaim set-off is granted.

2. Hudson Toyota's motion for summary judgment is granted in full as follows:

a. Plaintiff is awarded $51,467.00, plus interest, from Crest Leasing Enterprises, Inc., for the first, second, and eighth car sales under the first, third, fifth, and tenth claims for relief set forth in the complaint;

b. Plaintiff is awarded $75,838.00, plus interest, from Metro Auto Leasing, Inc., for the third, fourth, fifth, and sixth car sales under the second, fourth, sixth, and tenth claims for relief set forth in the complaint; and

c. The contract of sale for the Chattel is hereby rescinded under the seventh claim for relief set forth in the complaint and plaintiff has all rights and entitlements to the Chattel.

3. Hudson Toyota's motion for punitive damages against Defendants is granted in the amount of $5,000.00 with the cost to be borne equally by Crest Leasing Enterprises, Inc., and Metro Auto Leasing, Inc.

4. The replevin bond is discharged and the surety on the replevin bond is released of all liability.

5. Hudson Toyota's motion for sanctions against Defendants and their attorney is granted in connection with the following: (i) Hudson Toyota's opposition to Defendants' motion to quash the court's ex parte order of

December 13, 1993; (ii) Hudson Toyota's opposition to Defendants' motion to consolidate this action with the antitrust action; and (iii) Hudson Toyota's motion to strike Defendants' counterclaim set-off. Hudson Toyota is therefore instructed to submit contemporaneous time sheets and disbursement records in connection with these motions within 30 days of the date of this order.

SO ORDERED.