In re CHATEAUGAY CORPORATION, Reomar, Inc., the LTV Corporation, et al., Debtors.

DIAMOND GATEWAY COAL COMPANY, Appellant,

v.

The LTV CORPORATION and LTV Steel Company, Inc., Appellees.

No. 89 Civ. 3977 (RJW).

United States District Court, S.D. New York.

Sept. 13, 1989.

Eckert Seamans Cherin & Mellott, Pittsburgh, Pa. (Richard W. Gladstone, II, Robert P. Simons, Brian M. Martin, of counsel), Haight, Gardner, Poor & Havens, New York City (Gary D. Sesser, of counsel), for appellant.

Levin & Weintraub & Crames, New York City (Herbert Stephen Edelman, Allen G. Kadish, of counsel), Reed Smith Shaw & McClay, Pittsburgh, Pa. (James H. McConomy, John C. Unkovic, Sean M. Coleman, of counsel), for appellees.

## OPINION

ROBERT J. WARD, District Judge.

Diamond Gateway Coal Company ("Diamond Gateway") appeals from an order of the bankruptcy court expunging and disallowing its claim against The LTV Corporation ("LTV") and LTV Steel Company Inc. ("LTV Steel") (collectively, "Debtors"). After a hearing on Debtors' Objection to Claims of Diamond Gateway, the bankruptcy court ruled that Diamond Gateway, prior to the institution of the bankruptcy proceeding, had repudiated the contract upon which it based its claims against Debtors. The court therefore entered an order expunging and disallowing Diamond Gateway's claim, and this appeal followed. For the reasons set forth below, the order of the bankruptcy court is reversed and the case is remanded for further proceedings consistent with this opinion.

## BACKGROUND

### 1. *The Agreement*

The facts underlying this appeal are not in dispute. On October 31, 1980, Diamond Gateway and the predecessor of LTV Steel entered into a fifteen year coal supply agreement (the "Agreement") pursuant to which Diamond Gateway was to sell coal to LTV Steel from a large underground mine located in Greene County, Pennsylvania (the "Gateway Mine"). Record on Appeal at 280 ("Record"). Under the Agreement, LTV is guarantor of LTV Steel's performance. *Id.* at 124. Clause 2 of the contract provides that LTV Steel purchase from Diamond Gateway, each year, an amount of clean coal "equivalent to the quantity produced by processing 450,000 tons of Raw Coal" from the Gateway Mine through a designated coal cleaning plant. *Id.* at 74.

Clause 15 of the Agreement, entitled "Liquidated Damages for Failure to Take Specified Quantities," provides:

> If for any Coal Year Buyer fails to take delivery of Clean Coal pursuant to this Agreement in the quantities specified pursuant to Clause 2, Buyer shall pay Seller as liquidated damages an amount equal to the quantity not taken for such Coal Year (less the quantities used in computing Other Charges under Clause 8 and liquidated damages under Clause 18), multiplied by 50% of the Current Clean Coal Value at the end of the Coal Year. In addition, Buyer shall also pay Seller as liquidated damages [certain additional costs].

*Id.* at 116. Clause 15 further provides that Buyer may, during the first quarter of the following Coal Year, make up any shortfall for which it has become obligated to pay under this provision, in an amount up to 25,000 tons of Clean Coal. *Id.* at 117—118.

Under the Agreement, in the event that LTV Steel in any Coal Year takes less than 75% of the quantity of coal specified in Clause 2 (minus allowances for failure to take coal for reasons of force majeure), Diamond Gateway has the right, pursuant to Clause 17, to terminate the Agreement.

The Agreement provides that, should Diamond Gateway choose to exercise this termination option, the liability of both parties extends only up until the point of termination of the Agreement. *Id.* at 119.

### 2. *The Dispute*

By letter dated May 24, 1985, LTV Steel notified Diamond Gateway that, beginning June 1, 1985, LTV Steel would "not accept shipments of Gateway coal until further notice." *Id.* at 198. The letter further stated that "Clause 15 of the [Agreement] covers *Liquidated Damages for Failure to Take Specified Quantities.* Liquidated damages are handled at the end of each coal year." *Id.* (emphasis in original).

In response to this communication, Diamond Gateway took the position, in a letter dated August 12, 1985 (the "August 12 Letter"), that it did "not agree that Section 15 may be unilaterally invoked by LTV to avoid its obligation to take delivery of Clean Coal...." *Id.* at 159. The letter informed LTV Steel that Diamond Gateway "must consider LTV's stated intent not to take delivery of Clean Coal on and after October 1, 1985 as a breach and repudiation of its obligations under the Coal Supply Agreement." *Id.* Based upon this interpretation of the Agreement, Diamond Gateway requested adequate assurance of performance by LTV Steel. Nonetheless, Diamond Gateway made it clear that it "was, and is, prepared to supply LTV on and after October 1, 1985 with Clean Coal as required under Section 2 of the Coal Supply Agreement." *Id.*

LTV Steel responded in a letter dated September 11, 1985 clarifying its position with regard to future coal deliveries. LTV Steel informed Diamond Gateway that it had "not determined never to take Clean Coal under the Coal Supply Agreement," but only that it would not take any coal during October 1985, and that Diamond Gateway would be kept advised of its plans for subsequent months. LTV Steel disputed Diamond Gateway's right to request assurance that LTV Steel would always take delivery of coal rather than electing to pay liquidated damages under Clause 15 of the Agreement, but assured Diamond Gateway that it would continue to perform under the Agreement. *Id.* at 161.

Subsequently, LTV Steel informed Diamond Gateway that it wished to take delivery of Clean Coal under the Agreement for the month of November 1985. *Id.* at 304. By letter dated October 15, 1985, LTV Steel stated that it would "look upon any failure of delivery as a significant and substantial breach by Diamond Gateway of its obligations under the Coal Supply Agreement." *Id.*

In response to this demand for Clean Coal, Diamond Gateway, in a letter dated October 25, 1985 (the "October 25 Letter"), reiterated its belief that it had the right to request adequate assurance of performance under Section 2–609 of the Uniform Commercial Code.[1] Despite this position, Diamond Gateway attempted to accommodate LTV Steel by reaffirming its intention to perform under the Agreement pending a resolution of the parties' dispute. The letter stated, in part:

First, Diamond Gateway will deliver to LTV Steel Clean Coal as requested in your letter of October 15, 1985, under, and in accordance with, the price, quantity, and other terms of the Coal Supply Agreement. Second, Diamond Gateway is willing to deliver Clean Coal under the Coal Supply Agreement with our commitment that any Clean Coal taken and paid for by LTV Steel would not be the subject of any lawsuit or other action by Diamond Gateway. *Third, Diamond Gateway will continue to make deliveries of Clean Coal under the Coal Supply Agreement, as LTV Steel interprets*

---

**1.** Section 2–609(a) provides in pertinent part: When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he had not already received the agreed return.

Under Clause 25 of the Agreement, Pennsylvania law governs the interpretation of the contract. Record at 129. The Uniform Commercial Code has been enacted in Pennsylvania at 13 Pa.C.S.A. §§ 1101–9507 (Purdon 1984).

*the Agreement;* provided, however, that Diamond Gateway will not forfeit either its right to obtain a determination of the issues [in dispute] or any rights that may flow therefrom.

Record at 163 (emphasis added). In a subsequent letter dated October 29, 1985 (the "October 29 Letter"), Diamond Gateway reaffirmed its opinion that the failure of LTV Steel to provide adequate assurance of performance would constitute a repudiation by LTV Steel of the Agreement, but stated that Diamond Gateway remained "ready, willing and able to deliver Clean Coal for November and thereafter under and pursuant to the Coal Supply Agreement pending a determination of the issues" in dispute between the parties. *Id.* at 164.

LTV Steel responded to this communication, in a letter dated October 30, 1985, by asserting that "Diamond Gateway is in breach of its obligations under the Coal Supply Agreement," and that LTV Steel saw "no need for further communications on this subject at this time." *Id.* at 166.

In November 1985, Diamond Gateway filed "two lawsuits seeking a declaration of the parties' respective rights under the Coal Supply Agreement." [2] Record at 3 (Joint Stipulation of the Parties, filed April 1, 1987). In each suit, Diamond Gateway sought a declaration of the parties' rights and obligations under the Agreement and, in the event Diamond Gateway's interpretation of the Agreement prevailed, damages for breach of the Agreement by Debtors.

Also in November, Diamond Gateway sent to LTV Steel an invoice, pursuant to Clause 15 of the Agreement, for liquidated damages for Coal Year 1985. LTV Steel responded to this invoice, in part, with the proviso: "We consider your invoice to be an acknowledgment that the Gateway Coal Supply Agreement is in effect." Record at 18.

On December 13, 1985, LTV Steel stated by letter to Diamond Gateway that it would "resume taking delivery of Clean Coal under the Coal Supply Agreement (Gateway) in January, 1986." *Id.* at 202. In reply, Diamond Gateway stated in a letter dated December 17, 1985 ("the December 17 Letter"):

Pursuant to your request of December 13, 1985, Diamond Gateway Coal Company will, for the month of January, 1986, deliver Clean Coal to LTV Steel Company, Inc., pursuant to the Coal Supply Agreement.

*Id.* at 203. Because LTV Steel had informed Diamond Gateway that this request for Clean Coal did not imply any commitment on the part of LTV Steel to take delivery, rather than pay damages under Clause 15 of the Agreement, for any subsequent month, the December 17 Letter made clear that the January deliveries would "be made without prejudice to, and under a reservation of, Diamond Gateway's rights as more particularly set forth in [the federal and state lawsuits]." *Id.*

In order to comply with LTV Steel's request for Clean Coal under the Agreement for the month of January 1986, Diamond Gateway was obligated to reopen the Gateway Mine, which had been closed since July 1985. *Id.* at 284. During January 1986, Diamond Gateway delivered to LTV Steel 29,980 tons of Clean Coal in thirty separate barge lot installments. This was the total amount requested by LTV Steel. *Id.* at 202. LTV Steel accepted delivery of all thirty installments of Clean Coal, *Id.* at 285, stating in a letter to Diamond Gateway dated January 13, 1986 that "LTV Steel's position is that we have ordered coal for January under and in accordance with the Coal Supply Agreement, and we are pleased that you are responding to our request." *Id.* at 204. The amount paid by LTV Steel for the coal, pursuant to the pricing and premium provisions of the Agreement, was approximately three times

---

**2.** One complaint was filed in federal court in Pittsburgh, Pennsylvania against LTV Steel. The other was filed in state court in Pittsburgh against LTV Steel and LTV. Record at 385. Both suits were stayed, prior to any determination on the merits, by the Debtors' commencement of the below bankruptcy proceedings. Brief of Appellant, Diamond Gateway Coal Company, filed June 22, 1989 at 11.

the market price for January 1986 coal. *Id.* at 357.[3]

No further Clean Coal was requested by LTV Steel from Diamond Gateway, and on July 17, 1986 Debtors filed a petition for reorganization under chapter 11 of the Bankruptcy Code. Subsequently, the parties entered into a Joint Application and Stipulation (the "Joint Stipulation") for an order authorizing Debtors to reject the contract pursuant to 11 U.S.C. § 365(a).[4] The Joint Stipulation was adopted and approved by the bankruptcy court in an order dated April 27, 1987. It expressly provided that it was "without prejudice to any claim or defense which has been or may be asserted" in the state and federal lawsuits concerning the continued validity of the Agreement.

Diamond Gateway thereafter filed a timely notice of claim against Debtors based upon Debtors' rejection of the Agreement, and Debtors filed an objection to Claims of Diamond Gateway. A hearing was held in the bankruptcy court, after which the Debtors' Objection to Claims was sustained and the claim ordered expunged.

### 3. *The Bankruptcy Court Decision*

The bankruptcy court correctly determined that three issues necessitated resolution in order for the court to rule on Debtors' Objection to Claims of Diamond Gateway: (1) whether LTV Steel breached the Agreement by failing to take delivery of coal rather than pay liquidated damages under Clause 15; (2) if LTV Steel did not breach the Agreement by the foregoing actions, whether Diamond Gateway through its several letters and by institution of two lawsuits repudiated the Agreement; and (3) whether in either case the Agreement was reinstated by LTV Steel's

subsequent acceptance of and payment for Clean Coal in January 1986.

After an oral argument during which no factual dispute was presented, the bankruptcy court decided the issues "as if [they] were presented on a motion for summary judgment." *Id.* at 233. The bankruptcy court held that, under the Agreement, LTV Steel was entitled to elect to pay liquidated damages rather than take delivery of Clean Coal, and thus had not breached the Agreement either by failing to take delivery of coal, or by refusing to provide assurances of future performance under U.C.C. 2-609. The bankruptcy court construed Clause 15 of the Agreement, in the context of the document as a whole, as constituting a "take-or-pay" option for LTV Steel, under which LTV Steel could discharge its performance obligation either by taking delivery of Clean Coal, or by paying the liquidated damages specified in that clause. *See* Record at 466 (Conclusion of Law no. 4, January 5, 1989 order).

Turning to the issue of repudiation, the bankruptcy court found that Diamond Gateway's letters to LTV Steel of August 12, October 25, October 29, and December 17 of 1985, combined with the commencement of two lawsuits against Debtors, constituted a repudiation of the Agreement by Diamond Gateway prior to the filing of the Chapter 11 petition by Debtors. *See* Record at 467 (Conclusion of Law no. 8, January 5, 1989 order). The bankruptcy court further found that the subsequent actions of the parties did not serve to reinstate the Agreement. *See* Record at 525 (Conclusion of Law no. 2, April 18, 1989 order).

### DISCUSSION

This Court has jurisdiction to hear the instant appeal under 28 U.S.C. § 158(a),

---

**3.** In their answer to Diamond Gateway's complaint filed in the state court action, Debtors stated that, because of the "mutual mistake" of the parties in setting the pricing terms of the Agreement, "the price at which coal can be purchased from sources other than Diamond Gateway is far less than half the contract formula price at this time." Debtors asserted that, because of this mutual mistake, "Diamond Gateway has been receiving and will continue to receive an unintended windfall by LTV Steel's

past and/or continued purchases of coal at the contract formula price." Record at 446–447.

**4.** Section 365(a) provides, in pertinent part:
   ... the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.
   11 U.S.C. § 365(a). Under section 365(g), the rejection of an executory contract constitutes a breach except in certain enumerated circumstances not present in this case.

which provides in part that "[t]he district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees ... of bankruptcy judges...." Appellant Diamond Gateway timely filed a Notice of Appeal with respect to the bankruptcy court's April 18, 1989 final order (incorporating its January 5, 1989 interlocutory order) disallowing and expunging Appellant's claim against Appellees.

### 1. *Standard of Review*

■ The bankruptcy court's findings of fact may not be set aside unless clearly erroneous. Bankruptcy Rule 8013, 11 U.S.C. Its conclusions of law, however, must be reviewed *de novo* by the district court. *In re Tesmetges*, 47 B.R. 385, 388 (E.D.N.Y.1984); *In re O.P.M. Leasing Services, Inc.*, 79 B.R. 161, 162 (S.D.N.Y.1987). In its January 5, 1989 interlocutory order, (which was incorporated into its April 18, 1989 final order), the bankruptcy court found that there were "no issues of material fact which would require an evidentiary hearing" with respect to the first two questions under consideration, and thus those questions were decided "as if [they] were presented on a motion for summary judgment." Record at 464. Similarly, with respect to the third issue before the bankruptcy court, the April 18, 1989 order stated that there was "no dispute as to the material facts herein...." *Id.* at 524. Because the facts underlying the instant appeal are not in dispute, and all relevant issues are legal ones, the proper standard of review in this case is *de novo*.

### 2. *The Merits*

■ The bankruptcy court correctly determined that, under the terms of the Agreement, LTV Steel was entitled to elect

---

**5.** The Agreement provides, in Clause 23(a):
This Agreement (including the exhibits hereto) constitutes the entire agreement between the parties pertaining to the purchase and sale of Clean Coal and supercedes all prior and/or contemporaneous agreements and/or understandings of such persons in connection therewith.
Record at 128.

---

to pay the amount specified in Clause 15 without thereby breaching the Agreement. Record at 530 (Conclusions of Law nos. 3 & 4, January 5, 1989 order).

■ Under Pennsylvania law, where a contract is by its own terms integrated,[5] and is complete and unambiguous on its face, parol evidence may not be admitted to vary the terms of the written agreement. *See e.g., In re F.A. Potts and Co., Inc.*, 42 B.R. 712 (Bkrtcy.E.D.Pa.1984); *Borrell v. Borrell*, 346 Pa.Super. 1, 498 A.2d 1339 (1985); *Commonwealth Dep't of Transportation v. Westmoreland Engineering Co.*, 87 Pa.Comw. 285, 487 A.2d 78 (1985). In construing the Agreement, "it is fundamental that the intention of the parties is controlling, and that intention must be ascertained from the entire instrument." *Sharp v. McKelvey*, 196 Pa.Super. 138, 172 A.2d 580, 582 (1961) (citing *Waldman v. Shoemaker*, 367 Pa. 587, 80 A.2d 776 (1951)). Furthermore:

[e]ach and every part of the agreement must be taken into consideration and given effect if possible, and an interpretation will not be given to one part which will annul another part. *Neal D. Ivey Co. v. Franklin Associates*, 370 Pa. 225, 87 A.2d 236; *Powell Appeal*, 385 Pa. 467, 123 A.2d 650; *Cerceo v. DeMarco*, 391 Pa. 157, 137 A.2d 296; *Bryne [sic] v. Bushkoff*, 177 Pa.Super. 101, 110 A.2d 813.

*Id.*

When the language of Clause 15 of the Agreement, which provides for the payment of "liquidated damages" in the event of LTV Steel's failure to take delivery of specified quantities of Clean Coal, is read in the context of the Agreement as a whole, it is clear that the clause is intended to provide alternative modes of performance for LTV Steel.[6] Construing Clause 15

---

**6.** The use of the term "liquidated damages" to describe the payments to be made under Clause 15 does not necessarily connote breach. *See, e.g.,* 5 Williston on Contracts § 781, at 704–08 (3d ed. 1961) ("A contract may belong to the [class of alternative contracts] even though the term 'liquidated damages' is applied in the contract to one alternative").

in the way that Appellant urges would render meaningless the termination provision of Clause 17.

Appellant argues that the termination option provided it under Clause 17, which is triggered by a failure of LTV Steel to take at least 75% of the amount of Clean Coal specified under Clause 2, merely distinguishes a major from a minor breach and provides an alternative remedy for any major breach. This interpretation of the Agreement is untenable. According to such a reading of the contract, in the event LTV Steel (for reasons other than force majeure) took no coal for a particular month, Diamond Gateway would have the option either of terminating the Agreement pursuant to Clause 17, or of suing for breach of the entire Agreement. The former course would allow Diamond Gateway to recover liquidated damages only up to the point of termination, but would allow no recovery based upon the remaining term of the Agreement. The latter course, on the other hand, would permit recovery up to the point of termination and, in addition, damages for breach of the entire remainder of the Agreement. Such a choice is no choice at all—the latter option encompasses the former. Because Appellant has suggested, and this Court can envision, no scenario in which mere termination would be preferred over damages for breach in a situation implicating Clause 15 damages, the Court finds that Clause 15 was intended to express alternative means of performance open to LTV Steel. Thus, as the bankruptcy court correctly found, LTV Steel did not breach the Agreement by electing to pay damages under Clause 15 rather than take delivery of coal in any given month.

The bankruptcy court erred, however, in its determination that Diamond Gateway, by advancing an erroneous interpretation of the Agreement while still promising full performance, anticipatorily repudiated the Agreement. Under the law of Pennsylvania, the test for determining whether an anticipatory repudiation has occurred is strict. According to the Pennsylvania Supreme Court, "to constitute anticipatory breach under Pennsylvania law there must be 'an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so.'" *2401 Pennsylvania Ave. v. Federation of Jewish Agencies,* 507 Pa. 166, 489 A.2d 733, 736 (1985) (quoting *McClelland v. New Amsterdam Casualty Co.,* 322 Pa. 429, 185 A. 198 (1936)). The Uniform Commercial Code, in comment 1 to section 2–610,[7] "appears to retain the common law requirement that a statement of intention not to perform must be positive and unequivocal." J. White & R. Summers, Uniform Commercial Code 239 (3d ed.1988).

Similarly, "a demand for greater performance than agreed upon constitutes a repudiation 'when under a fair reading it amounts to a statement of intention not to perform except on conditions which go beyond the contract.'" *Id.* at 238–39 (quoting UCC § 2–610 comment 2). In either situation—whether a simple statement of intent not to perform, or a statement of intent not to perform except upon a condition which goes beyond the contract—the pivotal inquiry must be whether there was manifested the requisite intention not to perform under the contract. It is this necessary element which is lacking under the facts of the present case.

In each of the four letters cited by the bankruptcy court as evidencing Diamond Gateway's purported repudiation of the Agreement, Diamond Gateway made clear its continued willingness to perform under the Agreement as interpreted by LTV Steel pending resolution of the parties' dispute. At no time did Diamond Gateway state an intention not to perform, and it certainly did not do so with the clarity and unequivocalness required under Pennsylvania law.

In the August 12 Letter, Diamond Gateway requested adequate assurance of future performance from LTV Steel, and stated its belief that LTV Steel's interpretation

---

**7.** Comment 1 to section 2–610 states that "anticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance."

of the Agreement was erroneous and would constitute a breach of the Agreement if LTV steel continued to act upon it. The letter ended: "I trust that we will continue to work together in a spirit of mutual cooperation, but LTV's refusal to take Clean Coal causes us grave concern." Although Diamond Gateway was mistaken in its belief that it was entitled, under the UCC, to request assurance of performance from LTV Steel, nowhere did the August 12 Letter state that Diamond Gateway intended not to perform under the contract.[8] On the contrary, the August 12 Letter made clear that Diamond Gateway "was, and is, prepared to supply LTV on and after October 1, 1985 with Clean Coal as required under Section 2 of the Coal Supply Agreement."

Similarly, the October 25 Letter did not contain any clear statement of an intention not to perform under the Agreement. It contained, in fact, a clear statement of a continued willingness to perform despite any disagreement between the parties as to the proper interpretation of Clause 15. The letter stated: "... Diamond Gateway will continue to make deliveries of Clean Coal under the Coal Supply Agreement, as LTV Steel interprets the Agreement...." Diamond Gateway's reservation of the right to obtain a determination of the disputed issue in no way negates this clear statement that it would perform. *See, e.g., Bill's Coal Company v. Board of Public Utilities*, 682 F.2d 883 (10th Cir.1982), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983) (urging of erroneous interpretation of contractual clause, even if done in bad faith, did not amount to anticipatory repudiation where neither party's performance under the contract was thereby affected).

The October 29 Letter again made clear that Diamond Gateway remained "ready, willing and able" to perform under the Agreement pending a resolution of the disputed issues. Finally, the last of the four letters found by the bankruptcy court to constitute "elements" of Diamond Gateway's repudiation—the December 17 Letter—nowhere stated an intention on the part of Diamond Gateway not to perform, but instead informed LTV Steel that it would deliver the coal ordered by LTV Steel for the month of January 1986 "pursuant to the Coal Supply Agreement." Further evidencing its intent to continue to supply Clean Coal under the Agreement, Diamond Gateway, at great expense, reopened the Gateway Mine, which had been closed prior to the request for January coal.

■ Appellees argue that, by interpreting Clause 15 in the way that it did, Appellant stated an intent not to perform except on a condition which went beyond the contract. According to this argument, by requiring LTV Steel to give up its "pay" option to which it was entitled under the Agreement, Diamond Gateway conditioned its performance and thereby committed an anticipatory breach. This argument is misdirected. Although Diamond Gateway did press an erroneous interpretation of the Agreement, it never stated that it would not fully perform under the Agreement *as interpreted by LTV Steel*, pending a resolution of the dispute. Diamond Gateway did not, as required for a repudiation to have occurred, state an "intention not to perform except on conditions which go beyond the contract." UCC § 2–610, comment 2. As the official comment to § 2–610 makes clear:

> Under the language of this section, a demand by one or both parties for more than the contract calls for in the way of counter-performance is not in itself a repudiation nor does it invalidate a plain expression of desire for future performance.

---

8. In this regard, it is instructive to note precisely what Diamond Gateway sought from LTV Steel. It requested assurance that LTV Steel would continue to take delivery of Clean Coal under the Agreement. The sole performance required of Diamond Gateway under the Agreement was delivery of Clean Coal to LTV Steel. If LTV Steel chose, as in fact it did, to "pay" rather than "take" under Clause 15, no performance by Diamond Gateway would be called for besides simply accepting the requisite payments. Thus it is not logically possible that Diamond Gateway, by requesting that LTV Steel "take" rather than "pay," was stating an intention not to perform in the event LTV Steel refused this request, since in that case no performance would be required of it.

*Id.* Thus, the mere demand that LTV Steel renounce its "pay" option, not coupled with a statement of intention not to perform unless LTV Steel acceded to this demand, did not amount to a repudiation of the Agreement by Diamond Gateway. *Cf. e.g., 2401 Pennsylvania Avenue Corp. v. Federation of Jewish Agencies,* 507 Pa. 166, 489 A.2d 733 (1985) (statements refusing to acknowledge validity of lease insufficient to meet requirement for anticipatory repudiation of absolute and unequivocal refusal to perform); *Oak Ridge Construction Co. v. Tolley,* 351 Pa.Super. 32, 504 A.2d 1343 (1985) (letter stating that charges for work performed were "in dispute or disagreement" and requesting resolution under arbitration clause was not a repudiation, where letter did not contain an unequivocal refusal to pay the charges); *Copylease Corp. of America v. Memorex Corporation,* 403 F.Supp. 625 (S.D.N.Y.1975) (statements that contract not binding, not coupled with statement of intent not to perform, did not amount to anticipatory repudiation).

 Finally, Appellees argue that Diamond Gateway repudiated the Agreement by filing the state and federal lawsuits seeking damages for the alleged breach of the Agreement by LTV Steel. The Court rejects this argument. As noted above, unless the actions of Diamond Gateway implied a clear and unequivocal intention not to perform its obligations under the contract, no repudiation can have occurred. As the Court of Appeals for the Tenth Circuit has stated in a similar context:

> If a seller's interpretation of a termination clause is ludicrous, the buyer should ignore it; if the interpretation might prevail in a court of law, the seller has a right to urge it.

*Bill's Coal Company v. Board of Public Utilities,* 682 F.2d 883, 886 (10th Cir.1982).

That Diamond Gateway's interpretation of the Agreement would not have prevailed does not transform a clear statement of willingness to perform pending determination of the issues into an anticipatory repudiation of the Agreement. If such were the case, a party believing the other party to a contract to be in breach would have no recourse other than risking breach itself in the event it mistakenly pressed any claim. Appellees have not cited any case to this Court in which the filing of a lawsuit alone was held to constitute a repudiation, and this Court declines to so hold.[9]

The Court need not address the issue of reinstatement of the Agreement, since it finds that the Agreement was not repudiated in the first instance by Diamond Gateway.

### CONCLUSION

The bankruptcy court correctly determined that Clause 15 of the Agreement allowed LTV Steel to choose between the alternative performances of taking delivery of Clean Coal or paying the requisite damages as specified in that clause. The bankruptcy court was incorrect, however, in its determination that Diamond Gateway repudiated the Agreement prior to the institution of the bankruptcy proceeding. Accordingly, the order of the bankruptcy court disallowing and expunging the claims of Diamond Gateway is reversed, and this case is remanded to that court for further proceedings consistent with this opinion.

It is so ordered.

9. Much was made in the Brief of Appellees of the fact that, although self-styled suits for declaratory relief, the lawsuits sought damages for breach of the Agreement. The bankruptcy court, too, noted that Diamond Gateway in its lawsuits did not seek specific performance of the Agreement. Presumably this evidenced a repudiation because Diamond Gateway chose, in the event its interpretation of the Agreement were to prevail, to collect money damages rather than force LTV Steel to take delivery of Clean Coal for the remainder of the term of the Agreement. However, coupled with its clear statements of willingness to perform under the Agreement as interpreted by LTV Steel pending the outcome of the lawsuits, the nature of the relief requested by Diamond Gateway in the suits is irrelevant. If LTV Steel had been found to be in breach, there is no reason why Diamond Gateway should have been precluded from seeking money damages.