In re **WEST 56TH STREET ASSOCIATES, Debtor.**

No. 94 Civ. 6807 (JGK).

United States District Court, S.D. New York.

May 15, 1995.

Rajiv Khanna, New York City, for appellee.

## OPINION AND ORDER

KOELTL, District Judge:

This is an appeal pursuant to 28 U.S.C. § 158(a) by the Board of Managers of the Cityspire Condominium ("Board") from a final order dated July 23, 1994 of the Honorable Francis G. Conrad of the United States Bankruptcy Court, Southern District of New York ("Order"). In the Order, the Bankruptcy Court found that the Board breached two stipulations it had entered into with Vivian Cheng–Khanna, the appellee. The Court awarded Ms. Cheng–Khanna (1) $100,000.00 in punitive damages, (2) $68,500.00 ($100.00 per day from August 14, 1992 to July 1, 1994) pursuant to a provision in the second stipulation, (3) $25,508.45 in out-of-pocket expenses incurred in enforcing the terms of the stipulations, (4) $500.00 because the Board had filed an objection to Ms. Cheng–Khanna's proposed order that the Bankruptcy Court found frivolous and (5) certain injunctive relief. The Board appeals the punitive damages award and the damages awarded pursuant to the clause in the second stipulation. The Board argues that the Bankruptcy Court erred as a matter of law with respect to these two awards.[1]

### I.

This case arises out of a dispute between Ms. Cheng–Khanna and the Board concerning the noise level in Ms. Cheng–Khanna's apartment. Both Ms. Cheng–Khanna, who owns her condominium, and the Board are creditors of the debtor West 56th Street Associates, the former owner of Ms. Cheng–Khanna's building. During the course of the contested confirmation hearing of West 56th Street Associates, Ms. Cheng–Khanna and the Board entered into a stipulation of settlement pursuant to which Ms. Cheng–Khanna agreed, among other things, to withdraw her claims and objections to the plan of reorganization in exchange for the Board's perfor-

Jay S. Auslander, Eric B. Levine, Wolf Haldenstein Adler Freeman & Herz, New York City, for appellant.

1. The appellant withdrew the other three issues listed in its Statement of Issues on Appeal dated August 15, 1994 at oral argument on March 24, 1995 and subsequently. (*See* Transcript of Oral Argument and Letter of Jay S. Auslander to Judge Koeltl dated 4/13/95.)

mance of certain remedial measures in her apartment. Ms. Cheng–Khanna and the Board subsequently entered into a second stipulation on August 14, 1992 which, among other things, incorporated the terms of the first stipulation and provided for a certain amount of damages if the Board failed to complete the remedial measures by August 21, 1992.[2]

2. The first stipulation, which was read into the record on June 11, 1992 provides, as reflected in the transcript:

This is a stipulation between the proponents of the plan and Vivian Cheng–Khanna.

Paragraph 1, Vivian Cheng–Khanna is now withdrawing the following.

A, her objection to the plan; B, her vote against the plan; C, her objections to any claims in this case; D, any claim she has in this case whether an administrative claim or a general claim.

Paragraph 2, Vivian Cheng–Khanna and the Board will forthwith exchange general releases of all claims up to the present date, other than claims relating to the noise in the—in Vivian Cheng–Khanna's apartment.

Paragraph 3, the Board, within six weeks, will, at its expense, take two remedial steps regarding the alleged noise in Vivian Cheng–Khanna's apartment.

A, the Board will add insulation [in] two risers in the mechanical room and in the same, two risers in the apartment.

B, the Board will install additional pipe hangers with isolators in the mechanical room. In connection with this, the Board will close the wall in the apartment—the walls in the apartment.

Paragraph 4, Vivian Cheng–Khanna and the Board will each, within three business days from the present day, designate an acoustical expert.

Paragraph 5, those two experts will, by mutual agreement, designate a neutral acoustical expert within a week thereafter.

Paragraph 6, if the two experts cannot agree on a neutral acoustical expert, the parties will, within a week thereafter, request that the American Arbitration Association appoint a neutral acoustical expert.

The Board and Vivian Cheng–Khanna will bear equally the American Arbitration Association fees and costs and will pay them as due.

Paragraph 7, the neutral expert so designated will do the following, after the two remedial steps described above are taken.

A, the neutral expert will determine whether there's a legal limit with respect to the particular kind of noise at issue here and if so, will identify that legal limit.

Paragraph B—that's subparagraph B. If the neutral expert determines that there is not an applicable legal limit, the neutral expert will then determine what he or she believes is an acceptable limit for the noise at issue here.

C, the neutral expert will determine, based on tests of all of the operating pumps running one and two at a time, whether the actual noise in the living room, the bedroom, and any of the combination of the pumps, one at a time or two at a time, exceeds the legal or acceptable limit described above as the case may be.

Paragraph 8, if the actual noise does not exceed that limit as set forth above, then Vivian Cheng–Khanna releases any claims against the Board or the proponents up to that date relating to the noise in the apartment.

Paragraph 9, if the actual noise does exceed the limit as set forth above, then A, Vivian Cheng–Khanna preserves any claim she may have against the Board for all damages other than punitive damages.

Vivian Cheng–Khanna agrees that she, in no circumstances, will seek punitive damages with respect to this claim. B, the Board preserves all defenses to any such claim.

Paragraph 10, the parties agree that this Court retains jurisdiction to enforce the terms of this settlement. However, if Vivian Cheng–Khanna, pursuant to Paragraph 9 of this agreement, commences an action relating to the noise, she'll do so in the State or Federal Courts in New York City and not in this Court.

Finally, Paragraph 11, nothing in this agreement has any effect on any claim that Vivian Cheng–Khanna has against Ikner, Bruce Ikner. . . .

Add to Paragraph 10—to Paragraph 11 or—this settlement agreement also does not effect any claim that Vivian Cheng–Khanna may have against the selling agent of Ikner . . .

As one more modification, the release that Vivian Cheng–Khanna will provide under Paragraph 2, will run not only to the Board, but to the Board's managing agent, Belmark. (R. 9, Pl.'s Exh. M–1 at 89–93.)

The second stipulation, dated August 14, 1992, provides:

WHEREAS, on June 11, 1992, Vivian Cheng–Khanna ("VCK") and Board of Managers of CitySpire Condominium (the "Board") entered into a Settlement Stipulation (the "June 11 Stipulation"), the terms of which are incorporated by reference herein; and

WHEREAS, the terms of the June 11 Stipulation are being modified, in part, by this Stipulation;

NOW THEREFORE, IT IS HEREBY STIPULATED AND AGREED THAT:

(1) The Board will perform all repairs which it agreed to perform pursuant to the terms of the June 11 Stipulation on or before August 21, 1992 and will furnish satisfactory evidence of completion of the same by facsimile or personal delivery to VCK's attorney, at the address set forth below his signature on this Stipulation, on or before 5:30 p.m. on August 24, 1992. The Board will also allow VCK's acoustical experts and engineers to inspect the mechani-

The stipulations served as a partial settlement of the long-running dispute between the parties concerning the acoustical noise level in Ms. Cheng–Khanna's apartment and the Board's purported liability for such condition. The parties were to designate an acoustical expert who would determine a legal or acceptable level of noise. If, after the Board performed the remedial measures, the actual noise fell below such level, Ms. Cheng–Khanna would release the Board with respect to all claims relating to the noise; if not, Ms. Cheng–Khanna preserved all claims for damages against the Board except any claims for punitive damages.

On February 9, 1993, Ms. Cheng–Khanna filed a motion before the Honorable Tina L. Brozman, to whom the case originally was assigned, to compel the Board to perform its obligations under the stipulations. At that point, the Board had installed two pipe hangers with isolators in the mechanical room of the building and had installed insulation around the two risers in the riser shaft in Ms. Cheng–Khanna's living room. Ms. Cheng–Khanna claimed that such measures were insufficient to satisfy the Board's obligations under the stipulations; she claimed that the Board was required to hang more pipe hangers, to resupport the risers that the Board had insulated, to insulate and resupport risers in a shaft near the bathroom and to spend more than the $750.00 it had spent on the repairs. The Board opposed the motion contending that it had satisfied its obligations under the stipulations. The parties argued the motion on June 8, 1993 before Judge Brozman, who ruled in part on the motion and set the matter down for a hearing on the remaining issues. Judge Brozman held that the Board had satisfied its obligation to install pipe hangers and that the Board had no obligation to resupport the risers. She set the matter down for an evidentiary hearing with respect to two aspects of the first stipulation that she found ambiguous—the type of insulation that should have been used and the location of the risers that the Board was obligated to insulate.

The case was then transferred to Judge Conrad who conducted a trial from June 29, 1994 to July 1, 1994. Subsequent to the trial, the Bankruptcy Court issued the Order that is the subject of this appeal. In the Order, the Bankruptcy Court found that the Board breached the two stipulations it had entered into with Vivian Cheng–Khanna and awarded Ms. Cheng–Khanna $100,000.00 in punitive damages, $68,500.00 ($100.00 per day from August 14, 1992 to July 1, 1994) pursuant to a provision in the second stipulation, $25,508.45 in out-of-pocket expenses incurred in enforcing the terms of the stipulations, $500.00 because the Board had filed an objection to Ms. Cheng–Khanna's proposed order that the Bankruptcy Court found frivolous and certain injunctive relief. The Bankrupt-

cal room of the CitySpire building upon twenty-four (24) hours' notice after said repairs have been completed by the Board. VCK and her attorney have the option, but not the obligation, to be present, along with VCK's acoustical experts and engineers, when the Board's agents perform the repairs.

(2) If, for any reason whatsoever, the two acoustical experts nominated, respectively, by VCK and the Board are unable to agree, as required by the June 11 Stipulation, upon a neutral acoustical expert on or before August 21, 1992, it shall be automatically deemed that the two acoustical experts have not been able to agree upon a neutral acoustical expert and VCK and the Board shall thereupon file a request, on or before August 26, 1992, with the American Arbitration Association to appoint a neutral acoustical expert, and shall diligently prosecute such request.

(3) All of the terms contained in the June 11 Stipulation shall remain unchanged, except to the extent modified by this Stipulation. The parties agree to carry out the terms of the June 11 Stipulation, as modified by this Stipulation.

(4) It is hereby clarified that the terms of the June 11 Stipulation, as modified by this Stipulation, shall not be affected by, and in fact supersede, the provisions for Injunction, Limitation of Liability or any other provision of the Second Amended Chapter 11 Plan of Reorganization of the Debtor, of which the Board is one of the proponents, or any other plan for reorganization of the Debtor.

(5) The Board agrees that it shall pay a penalty of $100 per day to VCK if it fails to perform its obligations under the June 11 Stipulation, as modified by this Stipulation. This penalty shall be in addition to all other remedies available to VCK, including, without limitation, her right to move this Court to compel the Board to perform its obligations under the June 11 Stipulation, as modified by this Stipulation.

(R. 9, Pl.'s Exh. M–4.)

cy Court did not award Ms. Cheng–Khanna compensatory damages because of their speculative nature and because of Ms. Cheng–Khanna's failure to mitigate her damages. (R. 8 at 509–10.) It also did not award Ms. Cheng–Khanna tort damages, finding that the case involved only a breach of contract. (R. 8 at 510.)

The issues of law that the appellant has raised are subject to this Court's *de novo* review. *In re Chateaugay Corp.*, 104 B.R. 637, 642 (S.D.N.Y.1989) (Ward, J.).

## II.

■ The Board argues that the Bankruptcy Court's award of $100,000.00 in punitive damages was erroneous as a matter of law because New York law does not permit an award of punitive damages for a breach of a private contract absent circumstances that are not present in this case.

■ The general rule in New York is that punitive damages are not available in breach of contract actions because such actions deal with wrongs between private parties. *Hudson Motors Partnership v. Crest Leasing Enters.*, 845 F.Supp. 969, 974 (E.D.N.Y.1994) (citation omitted). The New York Court of Appeals recently reviewed the circumstances in which punitive damages are available for a breach of contract in *Rocanova v. Equitable Life Assurance Soc'y*, 83 N.Y.2d 603, 634 N.E.2d 940, 612 N.Y.S.2d 339 (1994). *Rocanova* involved two first-party insurance actions alleging unfair claim settlement practices by the insurance company. Noting the general rule that "[p]unitive damages are not recoverable for an ordinary breach of contract as their purpose is not to remedy private wrongs but to vindicate public rights," the court explained:

However, where the breach of contract also involves a fraud evincing a 'high de-

gree of moral turpitude' and demonstrating 'such wanton dishonesty as to imply a criminal indifference to civil obligations', punitive damages are recoverable if the conduct was 'aimed at the public generally'.... Punitive damages are available where the conduct constituting, accompanying, or associated with the breach of contract is first actionable as an independent tort for which compensatory damages are ordinarily available, and is sufficiently egregious under the Walker standard to warrant the additional imposition of exemplary damages. Thus, a private party seeking to recover punitive damages must not only demonstrate egregious tortious conduct by which he or she was aggrieved, but also that such conduct was part of a pattern of similar conduct directed at the public generally.

*Id.* at 613, 634 N.E.2d at 943–44, 612 N.Y.S.2d at 342–43 (citations omitted).[3] Thus, under *Rocanova*, punitive damages are recoverable when (1) there has been egregious and independently actionable tortious conduct by the defendant and (2) such conduct was part of a pattern of conduct directed at the general public.

The circumstances of the present case clearly fail to satisfy the two-part test set forth in *Rocanova*. First, there has been no egregious and independently actionable tortious conduct by the Board. While the appellee argues that Judge Conrad made implicit findings that the Board committed tortious acts (and even the criminal act of perjury), this argument is belied by the Bankruptcy Court's explicit denial of tort damages. (R. 9 at 510.) Moreover, the record simply is devoid of any such findings. In denying the appellee's request for lost income and family income, the Bankruptcy Court observed: "[The appellee and her husband] could have hired lawyers to [litigate the case], and under

3. In *Walker v. Sheldon*, 10 N.Y.2d 401, 179 N.E.2d 497, 223 N.Y.S.2d 488 (1961), a case in which the Court of Appeals held that punitive damages were available where the defendant induced the plaintiff to enter into a publishing contract with fraudulent representations and that the defendant engaged in such conduct in dealing with the general public, the Court of Appeals explained:

Punitive or exemplary damages have been allowed in cases where the wrong com-

plained of is morally culpable, or is actuated by evil and reprehensible motives, not only to punish the defendant but to deter him, as well as others who might otherwise be so prompted, from indulging in similar conduct in the future.

*Id.* at 404, 179 N.E.2d at 498, 223 N.Y.S.2d at 490. (citations omitted).

this type of breach of contract, which is really what this is all about, is a [b]reach of contract, that's not a compensable damage. It just isn't." (R. 9 at 510.) Also, in denying the appellee's request for emotional damages, the Court explained: "[I]t is true that emotional distress under New York law is not compensable in a breach of contract action. It is just not." (R. 9 at 510.) And again, in stating that it would not award damages to the appellee's husband/attorney to compensate for his loss of custody of his child that he claimed was caused by the noise problem in the apartment, the court explained: "I am not going to award damages for that because I don't think there is a legal basis to do that on the contractual claim." (R. 9 at 521–22.)

The Bankruptcy Court obviously was disturbed by the conduct of the parties, especially the Board's, during the course of the litigation. (R. 9 at 523–24.) However, there is no authority to award punitive damages for this contract claim on such a basis, alone. The conduct of the Board during the litigation was not sufficiently probative of the requisite level of moral culpability or bad faith that, under the cases, justifies an award of punitive damages.

Second, there has been no proof that the Board engaged in a pattern of similar conduct directed at the general public. The appellee attempts to attribute to the Board an intent to further "a larger scheme" that reached beyond its dealings with her—she claims that she "was merely a pawn in a socially evil chess game" and that the Board would not settle with her, but would litigate the case "to death" because it did not want to open the door to the complaints of other apartment owners who might be encouraged to voice their complaints by a settlement. (Appellee's Brief at 34.) Appearing to accept such an argument, the Bankruptcy Court found: "[T]he Board was going to litigate this to death and on the basis of that, under New York Law, I think there is a [p]ublic interest to be affected here." (R. 9 at 522.) The appellee claims that a letter written by an attorney who represented the Bank of Nova Scotia, a co-proponent of the plan of reorganization, and not by a Board member, supports her contention. However, there is

no evidence that this statement fairly can be attributed to the Board. Moreover, there is no evidence that the Board was part of a general campaign against residents of other apartments or buildings.

While the circumstances of the present case plainly fail the *Rocanova* two-part test, the appellee argues that *Rocanova* is limited to the first-party insurance context and does not apply to this case. *Rocanova* is the most recent and authoritative discussion by the New York Court of Appeals on the requirements for punitive damages under New York law. It did not purport to be limited to insurance cases and, in fact, specifically applied the teaching of *Walker v. Sheldon*, 10 N.Y.2d 401, 179 N.E.2d 497, 223 N.Y.S.2d 488 (1961), which involved a publishing contract and not an insurance contract.

Nevertheless, the appellee is correct that there are cases decided outside of the insurance context permitting awards of punitive damages even without tortious conduct directed at the general public where the defendant's conduct evidences a high degree of bad faith. *See, e.g., Aero Garage Corp. v. Hirschfeld*, 185 A.D.2d 775, 777, 586 N.Y.S.2d 611, 613 (1st Dep't), *appeal denied*, 81 N.Y.2d 701, 610 N.E.2d 388, 594 N.Y.S.2d 715 (1992) (where the defendants "were fully aware from the outset that their actions were blatantly in breach of the agreement with plaintiff and yet displayed their willingness to go to any lengths to achieve their ends[,]" punitive damages for breach of contract were appropriate); *Williamson, Picket, Gross, Inc. v. Hirschfeld*, 92 A.D.2d 289, 295, 460 N.Y.S.2d 36, 41 (1st Dep't 1983) (punitive damages may be awarded where the defendant's actions "involve that degree of bad faith evincing a 'disingenuous or dishonest failure to carry out a contract'") (citation omitted); *see also Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 509 (2d Cir.1991) (Under New York law, punitive damages are appropriate in cases involving 'gross, wanton, or willful fraud or other morally culpable conduct.' Such conduct need not be directed at the general public.") (citations omitted), *cert. denied*, 503 U.S. 1006, 112 S.Ct. 1763, 118 L.Ed.2d 425 (1992); *Whitney v. Citibank*, 782 F.2d 1106, 1118 (2d Cir.1986) (pu-

nitive damages upheld against the defendant where the defendant was found to have knowingly induced and participated in a breach of fiduciary duty even absent conduct directed at the general public); *Hudson Motors,* 845 F.Supp. at 974 (even where the wrong associated with the breach is not aimed at the public, where "the actions of the breaching party 'involve that degree of bad faith evincing a disingenuous or dishonest failure to carry out a contract,' then punitive damages are appropriate.") (citations omitted).

Arguably, these cases do not accurately express New York law in view of the most recent statements by New York's highest court. In fact, courts have characterized as aberrational the line of cases that hold that the defendant does not have to commit a wrong against the general public before punitive damages can be awarded. *See, e.g., Parke–Hayden, Inc. v. Loews Theatre Management Corp.,* 789 F.Supp. 1257, 1267 (S.D.N.Y.1992) (Sweet, J.) (such cases "run decidedly against the grain of prevailing New York law[ ]"). *Rocanova* did not explicitly address these cases. However, even assuming that these cases have retained any validity, the Board's conduct in this case falls well outside the scope of morally culpable conduct necessary for an award of punitive damages as demonstrated by three cases upon which the appellee heavily relies: *Hudson Motors Partnership v. Crest Leasing Enters.,* 845 F.Supp. 969 (E.D.N.Y.1994); *Aero Garage Corp. v. Hirschfeld,* 185 A.D.2d 775, 586 N.Y.S.2d 611 (1st Dep't), *appeal denied,* 81 N.Y.2d 701, 610 N.E.2d 388, 594 N.Y.S.2d 715 (1992); and *Whitney v. Citibank,* 782 F.2d 1106 (2d Cir.1986).

In *Hudson Motors,* the court held that punitive damages were appropriate on the plaintiff's breach of contract claim. 845 F.Supp. at 978. The plaintiff had delivered eight automobiles to the defendants under contracts for sale. *Id.* at 972. The defendants, after taking possession of the automobiles, refused to pay for them and then sold seven of them to third parties despite the fact that they did not have valid title to them. *Id.* In holding that punitive damages were appropriate, the court observed that there

was no dispute that the defendants had intentionally and willfully breached their contractual obligations under the sales contracts. *Id.* at 975.

Noting that such breach, alone, would be insufficient for an award of punitive damages, the court found that the defendants "went beyond a mere breach of their contracts and embarked on a course to thwart at every turn plaintiff's contractual rights[ ]" and that "these efforts were performed in bad faith." *Id.* This course of conduct included using "self-help" to remedy the plaintiff's alleged violation of the New York antitrust law by selling cars to third parties without paying the plaintiff for them, defying a court order that directed the seizure of the one car that had not been sold to a third party, moving to quash the order of seizure on frivolous grounds and submitting an affidavit to the Court containing false or at least "suspect" information. *Id.* at 975–77. The Court, based on all of this evidence, concluded that the defendants' behavior was sufficiently "egregious" to warrant punitive damages. *Id.* at 976. It found that the circumstances of that case warranted the "rare" imposition of punitive damages for breach of contract even though the wrongful conduct of the defendants was not directed at the public because "the twin aims of punitive damages"—punishment and deterrence—would be vindicated by such an award. *Id.* at 976–78.

In *Aero Garage,* the trial court had awarded the plaintiff $150,000.00 in punitive damages for the defendants' breach of contract. 185 A.D.2d at 776, 586 N.Y.S.2d at 612. The plaintiff was a successor lessee of property leased by the defendants. *Id.* at 775, 586 N.Y.S.2d at 612. The lease required the landlord to obtain a certificate of occupancy for the property and to pay the costs incurred in connection with any necessary extensions or renewals of the certificate during the term of the lease. *Id.* In clear violation of these contractual obligations, the defendants withdrew their application for a necessary extension and told the plaintiff that they wished to buy out the lease so that they could build a high-rise apartment on the property. *Id.* at 776, 586 N.Y.S.2d at 612.

When the plaintiff submitted its own application for renewal, which was granted, the defendants brought "and vigorously prosecuted" several administrative appeals which resulted in the recommendation by the Department of Buildings that the certificate be revoked. *Id.* Subsequent to the plaintiff's filing suit, the defendants defied court injunctions forbidding them from making or continuing any application for revocation of the occupancy certificate. *Id.*

In holding that the defendants' conduct justified the imposition of punitive damages, the Appellate Division explained:

> Defendants were fully aware from the outset that their actions were blatantly in breach of the agreement with plaintiff and yet displayed their willingness to go to any lengths to achieve their ends. We cannot agree with the dissent that this attempt on landlords' part to 'obtain a solution more in accord with their own interests' should not be penalized when it invoked the types of methods used here, including the fully knowing and intentional breach of unambiguous contractual provisions, the flouting of court ordered injunctions and the bad faith institution of administrative proceedings.

*Id.* at 777, 586 N.Y.S.2d at 613.

Finally, in *Whitney v. Citibank,* the case upon which the Bankruptcy Court relied in awarding punitive damages, the Court of Appeals upheld a $1,500,000.00 punitive damages award against Citibank for its inducement of and knowing participation in a breach of fiduciary duty. 782 F.2d at 1120. The case arose out of a partnership, made up of three partners, the purpose of which was to purchase land and develop it as a residential apartment. *Id.* at 1108. When relations among the three partners broke down, Citibank engaged in some "side-dealing" with two of the partners to the detriment of Whitney, the third partner. *Id.* at 1110. The district court found that Citibank had induced the breach of fiduciary duty by the other two partners and awarded compensatory and punitive damages. *Id.* at 1107. The district court found that the inducement was "morally culpable"—the Bank not only had engaged in side-dealing, but also had back-dated documents and otherwise falsified its records, "recklessly and wantonly" deceiving the plaintiff. *Id.* at 1114.

In upholding the award of the district court, the Court of Appeals explained that where "the defendant's conduct amounts to such gross, wanton or willful fraud, dishonesty, or malicious wrongdoing as to involve a high degree of moral culpability, making it appropriate to deter the defendants from engaging in similar conduct in the future and to induce the victim to take action against the wrongdoer[,]" punitive damages are appropriate. *Id.* at 1118. The court did not require tortious conduct directed at the public. *Id.*

The circumstances of the present case in no way rise to the level of those of the defendants in *Hudson Motors, Aero Garage* and *Whitney.* First, there was an intense dispute between the Board and Ms. Cheng-Khanna with respect to whether the Board had performed its obligations under the stipulations. This is not a case where a defendant blatantly violated a clear obligation; rather, it is a case in which the parameters of the Board's obligations under the first stipulation were so ambiguous that an evidentiary hearing was required to clarify them. Even the Bankruptcy Court noted that when the parties entered into the first stipulation, "neither one [of the parties] knew what they were talking about." (R. 9 at 514.) Moreover, the trial transcript is replete with testimony demonstrating the differences in understanding of the term "riser," further demonstrating the ambiguity of the stipulation. Second, the Board simply did not engage in the kind of egregious conduct that the defendants in the above-cited cases did. Even the Bankruptcy Court, while opining that the Board treated the appellee's husband with disdain, found that the circumstances of this case did not warrant tort damages, but rather fell well within the more garden-variety breach of contract case. (R. 9 at 510, 523.) And, in marked contrast to these other cases, the Bankruptcy Court did not award the appellee compensatory damages. *Cf. Hudson Motors,* 845 F.Supp. at 983; *Aero Garage,* 185 A.D.2d at 775, 586 N.Y.S.2d at 612; *Whitney,* 782 F.2d at 1107.

Therefore, even if *Rocanova* does not apply to this case, the award of punitive damages is indefensible under New York law.

■ A trial court's judgment with respect to whether to award punitive damages is entitled to considerable deference.[4] In *Whitney,* the court explained:

> Just when fraud, deceit or other wrongdoing becomes so evil and so morally culpable as to call for punishment obviously is a matter of judgment based on considered observation of the defendant's conduct in light of the ordinary morals of the marketplace and on an assessment of whether the punishment is needed and will be effective as a deterrent. Deference must be paid to the district court's findings forming the basis of its conclusion that a defendant's conduct was gross, wanton or morally culpable.

*Whitney,* 782 F.2d at 1117–18 (citation omitted); *see also Action S.A.,* 951 F.2d at 509 (upholding punitive damages for conduct that included fraud and noting that the trial judge "was in the best position to determine whether or not the award of punitive damages was an appropriate remedy."). However, in the present case, even deferring to the Bankruptcy Court with respect to the conduct of the Board, and accepting the findings by the Bankruptcy Court including the finding that neither tort nor compensatory damages were appropriate, and considering the absence of any specific findings that would support a punitive damages award under New York law, the Board's conduct falls considerably below the threshold level of egregiousness necessary to sustain a punitive damages award.

For all of the foregoing reasons, the award of $100,000.00 in punitive damages is reversed.

## III.

■ The appellant also argues that the award of $68,500.00 was erroneous as a matter of law. The Bankruptcy Court awarded the appellee $100.00 per day, from August 14, 1992 until July 1, 1994, pursuant to the provision in the second stipulation entered into by the appellant and the appellee that provides:

> The Board agrees that it shall pay a *penalty* of $100 per day to [Vivian Cheng–Khanna] if it fails to perform its obligations under the June 11 Stipulation, as modified by this Stipulation. *This penalty shall be in addition to all other remedies available to VCK, including, without limitation, her right to move this Court to compel the Board to perform its obligations under the June 11 Stipulation, as modified by this Stipulation.*

(R. 9, Pl.'s Exh. M–4.) The Board argues that the clause represents an unenforceable penalty. Ms. Cheng–Khanna argues that the clause represents a permissible liquidated damages provision.

■ Under New York law, the way in which parties characterize a provision in a contract that provides for a specified amount of damages upon breach is not controlling; calling a provision a "penalty clause" or a "liquidated damages provision" is not dispositive. *See, e.g., Truck Rent–A–Center v. Puritan Farms 2nd, Inc.,* 41 N.Y.2d 420, 425, 361 N.E.2d 1015, 1018–19, 393 N.Y.S.2d 365,

---

4. The Bankruptcy Court's findings of fact may not be set aside unless they are clearly erroneous. *See* Fed.R.Bankr.P. 8013; *see also In re McLean Indus., Inc.,* 30 F.3d 385, 387 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 934, 130 L.Ed.2d 880 (1995). While the decision whether to award punitive damages in circumstances in which such damages are available falls within the discretion of the finder of fact, *Collins v. Willcox Inc.,* 158 Misc.2d 54, 59, 600 N.Y.S.2d 884, 887 (Sup.Ct.N.Y.Co. 1992), the issue that has been presented on appeal is whether, given the facts that the Bankruptcy Court found, punitive damages are available as a matter of law. *See Le Mistral, Inc. v. Columbia Broadcasting Sys.,* 61 A.D.2d 491, 495, 402 N.Y.S.2d 815, 817 (1st Dep't 1978) ("The award of punitive damages *under circumstances warranting the allowance of same* rests in the discretion of the jury, or in the court where the case is tried without a jury.") (emphasis added).

Even if the award of punitive damages were reviewed under a clearly erroneous standard, it still would be reversed. Comparing the facts of the present case with those of the cases that have defined the standards for punitive damages under New York law, the Court is "'left with the definite and firm conviction that a mistake has been committed.'" *In re Manville Forest Prods. Corp.,* 896 F.2d 1384, 1388 (2d Cir.1990) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

370 (1977) ("In interpreting a provision fixing damages, it is not material whether the parties themselves have chosen to call the provision one for 'liquidated damages', as in this case, or have styled it as a penalty. Such an approach would put too much faith in form and too little in substance.") (citations omitted); *Hempstead Resources Recovery Corp. v. Long Island Lighting Co.*, 91 A.D.2d 542, 542, 457 N.Y.S.2d 15, 15 (1st Dep't 1982) (designation by the parties is not dispositive). The appellant here has the burden of proving that the clause to which it freely contracted is, in fact, a penalty. *Rattigan v. Commodore Int'l Ltd.*, 739 F.Supp. 167, 170 (S.D.N.Y.1990) (Mukasey, J.).

■ Liquidated damages provisions are enforceable, under New York law, when (1) actual damages would be difficult to quantify, or are not "readily ascertainable," and (2) the sum is a reasonable estimate of potential damages—in other words, the sum is not "plainly disproportionate" to the possible loss. *O.P.M. Leasing Servs., Inc. v. Revlon, Inc.*, 23 B.R. 104, 111 (Bankr.S.D.N.Y.1982) (citations omitted). New York courts construe ambiguous clauses as penalties and not as liquidated damages provisions. *See, e.g., Rattigan*, 739 F.Supp. at 169–70 ("Courts have tended, in doubtful cases, 'to favor the construction which makes the sum payable for breach of contract a penalty rather than liquidated damages, even where the parties have styled it liquidated damages rather than a penalty.") (citation omitted); *Vernitron Corp. v. CF 48 Assocs.*, 104 A.D.2d 409, 409–10, 478 N.Y.S.2d 933, 934 (2d Dep't 1984) ("[A]ny reasonable doubt as to whether a provision constitutes an unenforceable penalty or a legitimate liquidated damages clause should be resolved in favor of a construction which holds the provision to be a penalty.") (citation omitted). In *O.P.M. Leasing Servs.*, the court found that a clause that provided for a remedy in addition to a party's right to recover actual damages failed to satisfy the second prong of the test and thus was void as a penalty. *Id.* 23 B.R. at 112.

The Board has met its burden of proving that the clause in the second stipulation between the Board and Ms. Cheng–Khanna is an unenforceable penalty. First, while not dispositive, the stipulation calls the payment of $100.00 per day a "penalty." Second, the remainder of the clause demonstrates a clear intent to provide Ms. Cheng–Khanna with damages in addition to the typical remedies available for breach. Specifically, it purports to give the appellee the right to damages in addition to "all other remedies available to [her] ... without limitation[.]" (R. 9, Pl.'s Exh. M–4.) The appellee argues that "all other remedies available to VCK" could only mean "such remedies as law or equity permit in addition to the specified liquidated damages." (Appellee's Brief at 42.) She argues that she could have sought only enforcement of the stipulation in addition to $100.00 per day until the Board complied because if the stipulation permitted the specified damages in addition to actual damages, it would be an impermissible penalty clause. The appellee's argument is circular. Moreover, such an interpretation of the clause would render its inclusive language superfluous.

As an alternative to her argument that the clause represents a permissible liquidated damages provision, the appellee argues that even if the Court were to find that the clause is a penalty, it is enforceable in this case under *Denberg v. Parker Chapin Flattau & Klimpl*, 82 N.Y.2d 375, 624 N.E.2d 995, 604 N.Y.S.2d 900 (1993). In *Denberg*, the New York Court of Appeals held that a settlement agreement resolving a dispute involving an unenforceable forfeiture-for-competition provision may be enforced. *Id.* at 385, 624 N.E.2d at 1001–02, 604 N.Y.S.2d at 906–07. The court held that while the underlying clause was unenforceable, the settlement was not, based on the policy considerations of encouraging settlement. The court explained: "[P]ublic policy is best served by permitting parties to amicably resolve disputes arising under such provisions rather than forcing each such controversy to be decided by the judiciary." *Id.*, 624 N.E.2d at 1002, 604 N.Y.S.2d at 907.

*Denberg* does not apply to this case. Here, the appellant has raised an argument with respect to the enforceability of a clause in the actual stipulation of settlement. In *Denberg*, the Court of Appeals considered how to treat a settlement that was entered into following a dispute over a contract that contained an unenforceable provision. The facts of this case are too far removed from those of *Denberg* to find that this case is

controlled by *Denberg*. The *Denberg* court in no way indicated that an unenforceable provision of a settlement agreement could be enforced under the rationale that such enforcement would promote settlements.[5]

For all of the foregoing reasons, the award of $68,500.00 pursuant to the penalty provision in the second stipulation is also reversed.

### IV.

For all of the reasons set forth above, the Bankruptcy Court's Order, dated July 23, 1994, is reversed to the extent that it awarded $100,000.00 in punitive damages and $68,000.00 in additional damages.

**SO ORDERED.**

---

5. The appellee also relies on *New York v. Wallkill*, 170 A.D.2d 8, 572 N.Y.S.2d 758 (3d Dep't 1991), to support her argument that the Board should be held to its bargain and that the clause in the second stipulation should be enforced. In *Wallkill*, the state of New York had entered into a consent order with the defendant, who owned and operated a sewage plant that violated the applicable permit issued under the Environmental Conservation Law. *Id.* at 9, 572 N.Y.S.2d at 759. Pursuant to the consent order, the penalty for the violation was suspended, provided that the defendant would comply with a schedule for the construction of a new sewage plant that complied with the permit. *Id.* After the defendant failed to adhere to the schedule, the state brought a proceeding to compel compliance with the permit, to enforce the penalty provision of the consent order and to recover civil penalties from the defendant. *Id.* at 10, 572 N.Y.S.2d at 759. The court held that because the defendant had contractually bound itself to pay the fine, the court below erred in refusing to enforce the fine specified in the parties' consent order. *Id.* The present case is not controlled by *Wallkill* because *Wallkill* did not address a penalty provision that was legally unenforceable.